196 So.2d 97 (1966)
FIRSTAMERICA DEVELOPMENT CORPORATION, Petitioner,
v.
DAYTONA BEACH NEWS-JOURNAL CORPORATION, a Florida Corporation, Respondent.
No. 35060.
Supreme Court of Florida.
December 7, 1966.
Rehearing Denied February 8, 1967.
Nichols, Gaither, Beckham, Colson, Spence & Hicks and Robert Orseck, Miami, for petitioner.
Black, Cobb, Cole & Crotty and Thomas T. Cobb, Daytona Beach, for respondent.
Hugh C. Macfarlane and Macfarlane, Ferguson, Allison & Kelly, Tampa, for The Tribune Co.; Baynard & Baynard, St. Petersburg, for Times Publishing Co.; Henry F. Richardson, Palm Beach, for Perry Publications, Inc.; William C. Steel and Scott, McCarthy, Steel, Hector & Davis, Miami, for The Miami Herald Publishing Co.; Harold B. Wahl, of Loftin & Wahl, Jacksonville, for Florida Publishing Co., amici curiae.
DURDEN, Circuit Judge.
This case is before this court upon certification of the District Court of Appeals *98 for the Third District that the one question to be decided is of great public interest and of first impression in this state.
The issue created is of such a nature as to justify and require a ruling by this court at this stage of the litigation in the trial court. The necessity for such action will reveal itself with the progress of this opinion.
The point of law involved is one of venue and requires the interpretation and application of the Florida venue statute governing suits against domestic corporations. That statute, Section 46.04, Florida Statutes, 1965, F.S.A., provides, in part, as follows:
"Suits against domestic corporations shall be commenced only in the county * * * where such corporation shall have or usually keep an office for the transaction of its customary business, or where the cause of action accrued, or where the property in litigation is located; * * *".
The only phrase relevant to this suit is "where the cause of action accrued".
The facts necessary to consider are without dispute. The petitioner is the Firstamerica Development Corporation and it was the plaintiff in the Circuit Court. The respondent, Daytona Beach News-Journal was the defendant.
The petitioner is a land development company with its principal offices located in Broward County, Florida. It is engaged in the sale of real estate throughout Florida and is the owner of several tracts of land in Volusia County which it is offering for sale in small parcels.
The respondent publishes the Daytona Beach Morning Journal, the Daytona Beach Evening News, and the Sunday News-Journal. The respondent's plant, principal place of business, and primary area of distribution is in Daytona Beach, Volusia County, Florida.
It is admitted that the respondent sought and had limited circulation of its papers in Dade County. The extent of such circulation is not determinative on the issue of venue. Even though the respondent sought and obtained limited circulation in Dade County and in other areas of the state it is contended that respondent is subject to suit only in Volusia County.
The petitioner brought this action for libel against the respondent in the Circuit Court of Dade County seeking damages in the amount of $5,000,000.00. It is alleged that the respondent had published and circulated a series of articles which allegedly charged the petitioner with misrepresentation and dishonest advertising practices in the sale of its lands in Volusia County.
The respondent, by motion to dismiss or transfer, challenged the propriety of laying venue in Dade County. The trial judge, in an able opinion, held with the petitioner. 24 Fla. Supp. 177.
Following an interlocutory appeal the District Court of Appeals for the Third District reversed the Circuit Court and agreed with the respondent that venue could not be laid in Dade County. The District Court also supported its conclusion with an able opinion. 181 So.2d 565. These opinions amply demonstrate the conflict of authority in this country on the issue which we must determine.
The respondent has been supported in this proceeding by amicus curiae briefs filed on behalf of most of the major newspapers published and circulated in this state. They strongly urge the court to adopt a restricted rule of venue, asserting that if this is not done constitutional freedom of the press will be seriously impaired.
Long before this suit was filed this court had dedicated itself to the preservation of a free press. In Ross v. Gore (Fla. 1950), 48 So.2d 412, 415 we said:
"Since the preservation of our American democracy depends upon the public's receiving information speedily * * * it is vital that no unreasonable restraints *99 be placed upon the working news reporter or the editorial writer".
While language used in other opinions may be more picturesque, the simplicity and directness of this quotation from Mr. Justice Roberts is more compelling.
Long before this suit was filed this court had stated its awareness of the necessity of applying modern rules to the modern newspaper situation. In Layne v. Tribune Co. (1933) 108 Fla. 177, 187, 146 So. 234, 238, 86 A.L.R. 466, this court said:
"The modern daily newspaper is an institution of news dissemination that was unknown to the early common law. * * * None of these strict rules, however, was intended to take into account or to have any bearing upon present day phases of news dissemination, * * *".
Further in the Layne opinion Mr. Justice Davis said:
"Freedom of the press has long been a stated constitutional guaranty, yet it has always been held from an early date, that the constitutional guaranty of `freedom of the press' did not secure to libelers immunity from civil or criminal prosecution, but was simply intended to secure to the conductors of the press the same rights and immunities, and such rights and immunities only, as were enjoyed by the public at large."
Historically, the free-press amendment is construed to mean freedom from three major types of restraint: Censorship, licensing, and seditious libel, which is defamation of the government or authority. It was these autocratic and despised restrictions that were prohibited by federal and state freedom of press constitutional provisions.
Governmental licensing and censorship were pretty well deleted and obliterated from the Anglo-American system of law and government by the time the colonies declared their independence. Sedition acts continued to appear, even including the Sedition Act of 1798, 1 Statutes 596, after the Declaration of Independence and after the adoption of the United States Constitution.
It has been said that more blood flowed in the long and bitter battle against the hated sedition laws than for any other civil cause in English history. The invalidity of the Sedition Act has always been assumed by the Supreme Court of the United States. See New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, at page 724, 11 L.Ed.2d 686 at page 704, where Thomas Jefferson, as President is quoted as having said:
"I discharged every person under punishment or prosecution under the sedition law, because I considered, and now consider, that law to be a nullity, as absolute and as palpable as if Congress had ordered us to fall down and worship a golden image".
It was these restraints that the Bill of Rights sought to avoid.
Freedom of the press was never intended to be a special privilege extended to its publishers. On the contrary, it was conceived by the writers of the Constitution and of the Bill of Rights to be a right of the people in a democracy to unrestricted information and presentation of views on government for which the press was a tailor-made medium of dissemination. Freedom of the press, therefore, is a people's personal right rather than a property right.
It is a qualified right, since it is not construed as permitting press licentiousness or freedom from reponsibility for what is published. Freedom of the press therefore ends at that point where private rights begin or are infringed upon.
It is somewhat of an anomaly that the major segments of the free press would in their briefs urge this constitutional provision to support a position which appears contrary to the best admonitions of good journalism. The free press has long taken *100 the position that government and public officials are "fair game", and the courts have, with almost complete unanimity, supported that view. See series of annotations entitled "The Supreme Court and the right of free speech and press" reported in 93 L.Ed. 1151, 2 L.Ed.2d 1706 and 11 L.Ed.2d 1116.
The freedom of the press to support or oppose, praise or condemn, attack or defend institutions other than government, such as religion, education, the arts, medicine, law, the family, slavery and women's suffrage, to name just a few, is well established.
But throughout the whole course of history man and institutions have by the press been held to be accountable for their actions. That is all this opinion does  it says that a newspaper is accountable for its actions where it performed them  in greater or lesser degrees.
The raging argument in the Supreme Court of the United States as to whether the constitutional rights are "absolute" or are to be determined by applying the "balancing test" is discussed at length in the notes referred to above. We deem it sufficient to say here that the rights of two of its corporate citizens are in alleged conflict  obviously neither can have an absolute right over the other.
We have previously stated the necessity for applying modern rules of law to newspapers, but it is difficult to find a more understandable statement than is contained in Blackstone's Commentaries 34, pages 1326-27:
"The liberty of the press is indeed essential to the nature of a free state, but this consists in laying no previous restraints upon publications, and not in freedom from censure for criminal matters when published. Every free man has an undoubted right to lay what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press; but if he publishes what is improper, mischievous, or illegal, he must take the consequences of his own temerity * * * thus the will of individuals is still left free; the abuse only of that free-will is the object of legal punishment. Neither is any restraint hereby laid upon freedom of thought or inquiry; liberty of private sentiment is still left; the disseminating, or making public, of bad sentiments destructive of the ends of society, is the crime which society corrects."
The people of this nation are as fully committed to the flourishing of a free press as they are to the doctrine of separation of church and state and to the establishment of a free and independent judiciary. They have been, since they chose to follow the recommendation of Thomas Jefferson and included the guarantee of freedom of the press in the Bill of Rights.
Alexander Hamilton, in opposing this amendment, said:
"What signifies a declaration, `that the liberty of the press shall be inviolably preserved'? What is the liberty of the press? Who can give it any definition which would not leave the utmost latitude for evasion? I hold it to be impracticable; and from this I infer, that its security, whatever fine declarations may be inserted in any Constitution respecting it, must altogether depend on public opinion, and on the general spirit of the People and of the Government."
Even this language compels the conclusion that no such guarantee can be absolute.
Jefferson, in support of the amendment said:
"The people are the only censors of their governors; and even their errors will tend to keep these to the true principles of their institution. To punish these errors too severely would be to suppress the only safeguard of the public liberty. The way to prevent these irregular interpositions of the people is to give them full information of their *101 affairs thro' the channel of the public papers, & to contrive that those papers should penetrate the whole mass of the people. The basis of our government being the opinion of the people, the very first object should be to keep that right; and were it left to me to decide whether we should have a government without newspapers or newspapers without a government, I should not hesitate a moment to prefer the latter. But I should mean that every man should receive those papers, & be capable of reading them." At the same time Jefferson also said:
"`A declaration that the federal government will never restrain the presses from printing any thing they please, will not take away the liability of the printers for false facts printed.'"
There is not in existence any right, constitutional or otherwise which does not carry with an equal and balancing amount of responsibility.
Perhaps the failure is most simply stated in that we do not clearly understand the distinction between freedom of speech in private affairs and freedom of speech upon public issues. These distinctions are clearly pointed out by Alexander Meiklejohn in his book, Free Speech and its Relation to Self-Government. It is believed that this writer has a fond following in literary and journalistic circles. He stated, at pages 94-95:
"Every one of us, of course, recognizes, in words, the distinction between public and private welfare. * * * His private rights, including the right of `private' speech, are liable to such abridgments as the general welfare may require."
This court by the respondent and amicus curiae is urged to adopt what has been termed the "single publication rule", as opposed to the "multiple publication rule", as applied to libel suits. The distinctions between these two rules is best set out in a booklet published by the Practising Law Institute entitled "Defamation Actions" by J. Howard Carter and Andrew L. Hughes. It is there stated, at page 10, that:
"At common law each publication of the defamatory charge was considered a new wrong which gave rise to a new and distinct cause of action. The plaintiff could institute suit against each person who republished the libel.
"Under the common-law-multiple-publication rule, each separate publication of a libel, even by the same defendant, was considered to give rise to a separate cause of action. Thus, distribution of multiple copies of a book, magazine or newspaper containing a defamatory charge could give rise to countless causes of action; and if distribution extended to several jurisdictions, causes of action might arise in many jurisdictions.
"However, an increasing number of jurisdictions are adopting the `single-publication' rule, under which only one cause of action arises against the publisher as a result of the composite act of the publisher in releasing multiple copies of the publication at a given time. This rule was first applied in actions involving publishers of periodicals, but it has been extended to book publishers as well. The `single-publication' rule has generally been invoked in cases where the court sought to apply the statute of limitations. The rule provides a simple and certain test for determining when the cause of action arose. It is consistent with the uniform legislative policy of allowing short periods of limitation for actions for defamation. However, the `single-publication' rule has not yet been applied so as to fix the place of publication, for choice-of-law purposes, in cases involving distribution of the defamatory matter in several jurisdictions."
The development and application of the "single-publication rule" has been varied and inconsistent in the various jurisdictions that have resorted to it for one purpose or another in libel actions. To evaluate each *102 of those cases would expand this opinion beyond all reason and with no necessity to do so. To illustrate this thought one need only refer to a note reported in 62 Harvard Law Review 1041 entitled "The Single Publication Rule In Libel: A Fiction Misapplied". It is there stated:
"In the last three decades however, there has been an increasing tendency to employ the single publication fiction for purposes beyond those for which it was originally devised, and to situations where the concept is a complicating and often misleading factor".
* * * * * *
"The fiction of single publication has also been employed to determine the venue of an action for libel circulated in many counties of the same state. In the absence of statute, an action for libel may be maintained wherever the defamatory matter is circulated. Statutes in some states, however, require that a tort action be tried in the county where the `cause of action arose' or `where the injury occurred'. By applying to these provisions the fiction of the composite tort, some courts have held that the tort or injury occurs in the county where the defamatory matter is printed, or where it is first circulated. This application of the concept is rationalized by the argument that to hold that the cause accrues in every county where the defamatory matter is circulated would give the plaintiff the advantage  not available to the plaintiff in other tort actions  of being able to choose a forum where religious, political, and social predilections of the jurors are likely to operate in his favor. But, unlike those injured by other torts, a person libeled suffers injury, to his reputation, in every county where the libel has been distributed, and courts of other states have not found the choice-of-venue privilege an unconscionable advantage. In any state with a venue statute requiring the plaintiff, without practical alternative, to sue in the county where the cause accrued, the application of the single publication rule may give the defendant a similar forum-shopping advantage, which he may exercise by choosing a favorable county for the first release. No real injustice is wrought of course, if the plaintiff also has the option of suing in the county of his residence, where the damage to his reputation will ordinarily be greatest. But, whether the plaintiff has this alternative or not, interpretation of the venue statute in the light of the integrated publication doctrine seems an unenlightened method for the selection of a proper forum, since the county chosen by this means does not necessarily have a substantial connection with either party. Certainly the single publication rule should not be applied for venue purposes solely on the argument that `separate suits for each communication are impracticable; ergo, the whole transaction is a single cause of action, which must accrue at a single time and place'. Furthermore, engrafting such a limitation on the venue statute seems more appropriate for legislative than for judicial action."
For reasons heretofore and hereafter stated we agree with the writer of that article that imposing such a limitation on the venue statute must be by legislative action because we find there is no such limitation at this time.
Much has been said in the briefs about the unfairness of the rule that permits a plaintiff to select his forum.
Let us critically examine the rights and responsibilities of the press and of the public and under what circumstances resort may be had to a specific court for an alleged invasion of those rights.
There are sixty seven counties in this state. Most of them, it is assumed, has a newspaper, either daily or weekly. Many of them make no effort to publish news about anything beyond its county lines, nor do they care to distribute or circulate their *103 issues beyond those county lines. It is reasonable to assume that they will not be called upon to defend any litigation outside their "home" county. Such newspapers may be termed provincial in the geographical sense but not necessarily in the literary sense. Many of them are recognized as outstanding in the field of journalism.
Next in order of geographical size are newspapers that seek to expand their sphere of influence far and wide, beyond the narrow confines of county lines. Such newspapers may seek to become the news media to be relied upon in certain areas or on certain issues or for promoting liberal or conservative views. As such a newspaper strives for such recognition it expands its news coverage and its circulation beyond its own county lines. But note well that it is the determination of the newspaper itself that sets its course of action.
Such action is desirable and expansion rather than constriction of competing news media is conducive to the true free press and free people. But such a newspaper cannot exercise that right without exposing itself to the detriments of that action.
By the affidavit of the president the respondent admitted to the controlled circulation of a modest number of its newspapers containing the articles in Dade County. It was not the plaintiff who undertook to write such articles and it was not the plaintiff who undertook to circulate the newspapers in Dade County. It was the actions of the respondent-defendant that created Dade County as an available forum and no amount of pointing in an opposite direction can change this fact. If the respondent had not sought distribution of its journal in Dade County it is doubted that any conduct of the plaintiff would have caused the action to accrue there.
If we were to hold that a libel action could be brought only in the county in which the newspaper was printed the advantage of the press over the public would be unconscionable. Suppose a Dade County newspaper, circulated in Cedar Keys, maligned a city official of Cedar Keys. Would it be fair to either the free public or the free press to say that such official could only sue in Dade County where he is not known or damaged?
The holding of this court is therefore that by its own action in circulating the specific newspapers charged with carrying the alleged libelous articles in Dade County the respondent created a situation where the cause of action accrued in Dade County for venue purposes.
There are two authorities cited by counsel which should be referred to in this opinion. The first is the criminal case of Eberhardt v. Barker (1932) 104 Fla. 535, 140 So. 633. In that case it was held that the printer of an alleged criminal libel could be tried only in the county where the paper was composed and printed or where the primary circulation occurred. The Court stated:
"To hold otherwise, we would in effect hold that petitioner would be subject to indictment and trial for the same offense in each of the sixty-seven counties of the state where a copy of his paper may have been circulated, contrary to the statute and Declaration of Rights * * *".
However, the court carefully pointed out the restricted nature of this ruling by saying:
"This holding goes only to the question of venue in prosecutions for criminal libel as to the primary circulation. We do not decide the effect of mailing to or circulating a `marked copy' in any county or counties other than the county of publication and primary circulation, nor do we decide the question of venue where a bureau agency or office is maintained in another county or counties for the purpose of distribution or circulation."
*104 Another line of authority argued as persuasive is the fact that six states have adopted the Uniform Single Publication Act. Those states are Arizona, California, Idaho, New Mexico, North Dakota and Pennsylvania.
Section One of that act provides:
"No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance, such as any one edition of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture. Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions."
Section Two provides:
"A judgment in any jurisdiction for or against the plaintiff upon the substantive merits of any action for damages founded upon a single publication or exhibition or utterance as described in Section 1 shall bar any other action for damages by the same plaintiff against the same defendant founded upon the same publication or exhibition or utterance."
It should be carefully noted however, that this act makes no attempt to establish either jurisdiction or venue. It simply says that only one cause of action is created for a single publication regardless of its distribution and that when a judgment in any one jurisdiction has been obtained it shall act as a bar to any other action for damages by the same plaintiff against the same defendant founded upon the same publication.
Even if Florida had adopted the uniform single publication act exactly as printed here it would not determine the question of venue. It is clear from the commissioner's preparatory note to that act that there was a twofold purpose in proposing the uniform single publication act. The first purpose was to avoid the multiplicity of actions. The second purpose was to avoid the conflict of laws question when the publication crosses state lines. It does not have and should not be construed as having any bearing on venue whatsoever.
In its original development at common law and as set forth in the uniform laws the single publication rule has merit. There is much to say for limiting the plaintiff to one all-encompassing cause of action; a good argument can be made for a rule which would avoid a multiplicity of suits, restrict conflicts of laws and set one time for the running of limitations. The petitioner-plaintiff has voluntarily admitted the validity of such arguments and has committed itself to such restrictions.
Under such a rule a Florida Governor could bring only one action against an out-of-state publisher who distributes in Florida. But he could bring that action in Florida where he was damaged. Under such a rule a downstate citizen could bring one action and only one action against an upstate newspaper only if the upstate newspaper was circulating downstate.
The only issue before the court at the moment however is the question of venue and it is the determination of this court that the cause of action was properly brought in the Circuit Court of Dade County, Florida.
The question certified to this court having been answered the case is remanded to the District Court of Appeals for the Third District for further proceedings consistent with this opinion.
THORNAL, C.J., and DREW, CALDWELL and ERVIN, JJ., concur.