William F. BUCKLEY, Jr., Plaintiff-Appellant,

v.

NEW YORK POST CORPORATION, Defendant-Appellee.

No. 210, Docket 30757.

United States Court of Appeals Second Circuit.

Argued Nov. 30, 1966.

Decided Jan. 10, 1967.

C. Dickerman Williams, New York
City (Baker, Nelson, Williams & Mitchell,
New York City) (David S. Maclay,
Marsh, Day & Calhoun, Bridgeport,
Conn.), for plaintiff-appellant.

Jacob D. Zeldes, Bridgeport, Conn. (Arnold J. Bai, Elaine S. Amendola, Bridgeport, Conn.), for defendant-appellee.

Before MEDINA, FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge:

Buckley, a resident of Connecticut, brought this action in the Superior Court of Fairfield County in that state, against New York Post Corporation, a Delaware corporation having its principal place of business in New York City, to recover damages for libel. He claimed that two editorials appearing in April 1965 had been published maliciously and with reckless disregard of the truth. The Post, having removed the action to the United States District Court, sought dismissal on the ground that it was not subject to service of process in Connecticut.

Buckley asserted that two sections of Connecticut's "long-arm" statute adopted in 1959 and effective January 1, 1961, G.S. § 33–411(c) (3) and (4), gave the court jurisdiction. The sections subject a foreign corporation to suit in the state "on any cause of action arising as follows:

(3) out of the production, manufacture or distribution of goods by such corporation with the reasonable expectation that such goods are to be used or consumed in this state and are so used or consumed, regardless of how or where the goods were produced, manufactured, marketed or sold or whether or not through the medium of independent contractors or dealers; or

(4) out of tortious conduct in this state, whether arising out of repeated activity or single acts, and whether arising out of misfeasance or nonfeasance."

Answers to interrogatories disclosed that for a two year period ending May 1, 1965, an average of 1707 copies of the daily and 2100 copies of the weekend edition of the Post were distributed to persons in Connecticut by wholesale agents, mail or bus shipment consigned to dealers, and mail subscription;[1] that the Post received news dispatches relating to Connecticut from the Associated Press in New York City and from five Connecticut contributors; that it carried advertisements for not more than 15 Connecticut resorts once or twice weekly during the spring and summer, for four Connecticut restaurants once a week, and for three New York stores which indicated a Connecticut branch in some of their advertising. The figures as to papers distributed to persons and corporations in Connecticut did not include copies sold in New York City with the expectation they would be taken into Connecticut by residents returning home from work; the number of these was stated to be "indeterminable." The district judge held that the case was within subdivision (3) but not within subdivision (4); he dismissed the complaint on the ground that application of the long-arm statute to the Post under the circumstances would violate the due process clause of the Fourteenth Amendment.

I.

If decision depended solely on subdivision (3), we would uphold the dismissal on the basis that the statute did not apply and would not arrive at the issue of constitutionality. Apparently recognizing that the main thrust of subdivision (3) was to reach products liability actions, the judge thought it would be "too strained an interpretation" to distinguish between one case where "a nail is concealed in an unopened can of peas" and another where "defamatory words lie dormant in an unread newspaper" since in either event no "cause of action arises until some further act occurs." But the similarity between the two cases in that respect does not mean that they are similar in every other; the question remains whether the legislature meant subdivision (3) to deal with injuries to reputation at all.

Such an interpretation would hardly occur on a first reading. Con-

---

1. The figures for the days on which the alleged libels appeared were 2021 and 2026.

necticut's legislature appears rather to have been concerned with providing a more decisive answer for what has proved to be the vexing problem how far the "tortious conduct in this state" language of subdivision (4) and its variants in other long-arm statutes cover the out-of-state manufacturer or distributor of a defective product who had not himself been in the state but had shipped the product to someone who was or to someone who later sent or brought it there.[2] While the dominance of this purpose need not exclude others, "used or consumed" is scarcely a natural way to describe reading a newspaper. Moreover, although the statutory words can be stretched that far, they surely could not extend to a radio or television broadcast, and no reason appears why the legislature would have wished to bear more heavily on publishers of newspapers or magazines which enter Connecticut by land than on broadcasters who penetrate Connecticut's air. The contrary argument is that in Putnam v. Triangle Publications, Inc., 245 N.C. 432, 442, 96 S.E.2d 445, 453 (1957), the court thought "[i]t would seem that the language" of a similarly worded statute, on which Connecticut's may well have been modeled, was "broad and comprehensive enough" to sustain the service of process in an action for libel. But the North Carolina court did not discuss the purpose of the statute; the authorities it cited merely stressed the broad meaning of "goods"; and it had concluded that the statute could not be constitutionally applied to the defendant in any event. Furthermore, *Putnam's* value as an aid in determining the intention of the Connecticut legislature is small since the meager legislative history gives no indication that it was aware of the North Carolina ruling.

## II.

On the other hand, it would seem hard to deny that distributing two thousand copies of a libel about a resident in Connecticut is "tortious conduct in this state," under any ordinary meaning of those words in subdivision (4). See St. Clair v. Righter, 250 F.Supp. 148, 150 (W.D.Va.1966). Indeed, the original Restatement of Conflict of Laws, applying Professor Beale's "last event" approach, stated that "Where harm is done to the reputation of a person, the place of wrong is where the defamatory statement is communicated" and gave as an example that when A, broadcasting in state X, slanders B who is well and favorably known in state Y and the broadcast is heard there, "The place of wrong is Y." § 377 at 457 (1934). While the "last event" approach has been discredited as a basis for choice of law, see Ehrenzweig, The Place of Acting in Intentional Multistate Torts, 36 Minn.L.Rev. 1, 13–16 (1951), and current plans for the second Conflicts Restatement call for modification, see Restatement (Second), Conflict of Laws pp. 1–2 and §§ 379d, 379e (Tent. Draft No. 9, 1964), it does not follow that the influence of the concept on the thinking of legislators has been eradicated to such a point that they would not consider the distribution of a libel of a resident

---

2. For conflicting views on the situation where the defendant shipped the defective product into the state, contrast the majority opinion of Judge Fuld with the concurring opinion of Chief Judge Desmond in Singer v. Walker, 15 N.Y.2d 443, 464–467. 470–472, 261 N.Y.S.2d 8, 209 N.E.2d 68, cert. denied, Estwing Manufacturing Co. v. Singer, 382 U.S. 905, 86 S. Ct. 241, 15 L.Ed.2d 158 (1965). For opposing decisions where the product reached the state without the defendant having sent it there, contrast Feathers v. McLucas. 15 N.Y.2d 443, 458, 261 N.Y.S. 2d 8, 209 N.E.2d 68 (1965), with Gray v. American Radiator & Standard Sanitary Corp., 22 Ill.2d 432, 176 N.E.2d 761 (1961). Judge Fuld's opinion in Feathers cited the Connecticut statute as one expressly conferring "personal jurisdiction over a nonresident manufacturer charged with tortious activities in the manufacture of a product in another state which caused injury in the forum where the product was eventually marketed and sold," 15 N.Y.2d at 461, 261 N.Y.S.2d at 21, 209 N.E.2d at 77 & n. 9, and called attention to the recommendation of a similar statute by the New York Law Revision Commission, 15 N.Y.2d at 461, 261 N.Y.S.2d at 22, 209 N.E.2d at 78 n. 11.

to constitute tortious conduct in the state. Even if an out-of-state manufacturer who shipped a mislabeled and defective tool to an in-state dealer who sold it there did not "commit a tortious act within the state" within the New York statute, CPLR § 302(a) (2), as held in Singer v. Walker, supra note 2, damage to a person's reputation caused by sending a libel into the state where he lives could still be considered as arising from "tortious conduct" in that state; it could well be said that the publisher directly inflicts damage on the intangible reputation just as the frequently hypothesized but rarely encountered gunman firing across a state line does on the body, whereas sending the defective tool to the dealer merely created the condition whence damage would later arise.[3] Certainly the New York legislature seems to have thought that the out-of-state publisher would have come under the general "tortious act" language of its long-arm statute for it was at pains to exclude from coverage "a cause of action for defamation of character arising from the act".

The defendant contends that, however all this might stand as a matter of the normal interpretation of language, the "single publication" rule with respect to newspapers and other aggregate communications, Restatement (Second), Torts § 577A (Tent.Draft No. 11, 1965), requires a different conclusion, as was held with respect to the Illinois long-arm statute in Insull v. New York World-Telegram Corp., 172 F.Supp. 615, 632–634 (N.D.Ill.), aff'd, 273 F.2d 166 (7 Cir. 1959), cert. denied, 362 U.S. 942, 80 S.Ct. 807, 4 L.Ed.2d 770 (1960).[4] Although we join the late Judge Hincks in predicting that the courts of Connecticut will ultimately adopt the single-publication rule, Dale System v. Time, Inc., 116 F.Supp. 527, 529 (D.Conn.1953); Fouts v. Fawcett Publications, Inc., 116 F.Supp. 535, 536 (D.Conn.1953), we do not accept the conclusion defendant draws from this.

To hold that the single-publication rule exempts a publisher of a newspaper or magazine or a broadcaster from a long-arm statute that would otherwise have been applicable would be quite as artificial as the "last event" approach of the first Conflicts Restatement and the separate publication concept of Duke of Brunswick v. Harmer, 14 Q.B. 185, 117 Eng.Rep. 75 (1849), which the new rule was intended to overcome. Elliptical statements that a libel by newspaper is "complete" upon publication, though often accurate enough in their particular context, should not obscure that the purpose of the single publication rule is not to deprive a plaintiff defamed in another

---

**3.** Since Singer was decided under a New York statute with legislative history differing from that of the Connecticut long-arm statute, which the opinion expressly distinguished, we do not suggest that if a case like Singer were to arise under the Connecticut statute the decision would necessarily follow Singer, or that the Connecticut statute contemplates a distinction between directly inflicting harm within the state and merely creating a condition which later causes injury.

**4.** While further support for this position might be sought in cases under state venue statutes holding that the place of first publication is the place "where the injury occurred," Age-Herald Pub. Co. v. Huddleston, 207 Ala. 40, 92 So. 193, 37 A.L.R. 898 (1921); "in which the cause of action arose," O'Malley v. Statesman Printing Co., 60 Idaho 326, 91 P.2d 357 (1939); or "where the cause of ac-

tion may occur or accrue," Forman v. Mississippi Publishers Corp., 195 Miss. 90, 14 So.2d 344, 148 A.L.R. 469 (1943), we do not regard these as persuasive, since the statutes were regarded as contemplating a single county as the only appropriate venue, whereas more than one forum may be appropriate for torts with multistate elements. Furthermore, these cases were concerned not with whether a suit could be maintained in the state at all but with "what is the statutory law of venue," Age-Herald Publishing Co., supra, 92 So. at 197, and the considerations underlying a state's choice of the one proper county for venue differ substantially from those embodied in a long-arm statute. See, for a different view as to venue, Firstamerica Development Corp. v. Daytona Beach News-Journal Corp., 196 So.2d 97 (Sup.Ct.Fla. 1966).

state of a privilege to sue there which the legislature had granted generally to persons injured by wrongful conduct within its borders, but rather to protect the defendant—and the courts—from a multiplicity of suits, an almost endless tolling of the statute of limitations, and diversity in applicable substantive law. See 1 Harper & James, Torts § 5.16 (1956); Prosser, Torts 788–89 (1964). These goals can be sufficiently accomplished by holding that the plaintiff must collect all his damages in one action, that the statute of limitations begins to run on the initial publication, and that substantive issues will be governed by a single law—deciding just which is a harder nut to crack, see Restatement (Second) Conflict of Laws § 379e (Tent.Draft No. 9, 1964). To be sure, if only the interests of the defendant were to be considered, these objectives could be more certainly accomplished by minimizing the possibilities of suit at a place other than that of initial publication, since that forum presumably would apply its own statute of limitations and, *non constat* Restatement Second § 379e, might have a bias in favor of its own substantive law. But defamed persons have rights too; the interests of the defendant are not so dominant as to require a mechanical application of the single publication rule in such a manner that circulating a libel outside that state should be treated as if it never occurred. Moreover, as a matter of precedent, this court's holding, in Mattox v. News Syndicate Co., 176 F.2d 897, 904, 12 A.L.R.2d 988 (2 Cir.), cert. denied, 338 U.S. 858, 70 S.Ct. 100, 94 L.Ed. 525 (1949), that the single publication rule did not make the tort so "complete" at the place of publication as to preclude application of the substantive law of plaintiff's domicile, argues strongly against defendant's claim.

▪ The impropriety of reading a tortious conduct statute like subdivision (4) so as not to permit suit in the state of the plaintiff's residence when a libel had been distributed there would be plainer if, unlike the case before us, that state was far removed from the state of initial

publication and plaintiff was unknown in the latter. That would not only compel the plaintiff to travel to a distant place to enforce his rights but would enshrine as the only forum a state far removed from the evidence and unfamiliar with the plaintiff's reputation and thus with the damage done by the libel. But if Connecticut meant to permit a local suit by one of its residents unknown in Illinois who was libelled by a Chicago magazine circulating within Connecticut, it also meant to give a more widely known resident similar rights with respect to a libel in a New York City newspaper. The dubious reconcilability of the Insull decision with the broad construction later given the Illinois long-arm statute in Gray v. American Radiator & Standard Sanitary Corp., 22 Ill.2d 432, 176 N.E.2d 761 (1961), has been sharply noted. See D. Currie, The Growth of the Long Arm: Eight Years of Extended Jurisdiction in Illinois, 1963 U.Ill.L.F. 533, 552–54, cited and relied on by Chief Justice Kenison in Roy v. North American Newspaper Alliance, Inc., 106 N.H. 92, 205 A.2d 844, 847 (1964). See also Curtis Publishing Co. v. Birdsong, 360 F.2d 344, 348 (5 Cir. 1966) (concurring opinion of Judge Rives); Blount v. T D Publishing Corp., 423 P.2d 421 (Sup.Ct.N.M.1966). In the absence of any relevant decisions by Connecticut courts pointing in the direction of Insull, we decline to apply that decision to the construction of the Connecticut long-arm statute. Whether the circulation in that state of a libel of a person not residing or generally known there would also constitute "tortious conduct in the state," we need not here determine.

### III.

This brings us to the question whether subjecting the New York Post to this suit in Connecticut would violate rights accorded it by the Federal Constitution.

The past fifty years have seen such widespread adoption of statutes asserting personal jurisdiction over non-residents and so many decisions upholding their constitutionality as to constitute a verita-

ble *bouleversement* of the magisterial pronouncement in Pennoyer v. Neff, 95 U.S. 714, 727, 24 L.Ed. 565 (1878):

> "Process from the tribunals of one State cannot run into another State, and summon parties there domiciled to leave its territory and respond to proceedings against them."

There has been a "movement away from the bias favoring the defendant," in matters of personal jurisdiction "toward permitting the plaintiff to insist that the defendant come to him" when there is a sufficient basis for doing so. Von Mehren & Trautman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv.L.Rev. 1121, 1128 (1966). See also D. Currie, supra, 1963 Ill.L.F. at 553–54; and Hazard, A General Theory of State-Court Jurisdiction, 1965 Supreme Court Review 241. The path-breaking cases were Hess v. Pawloski, 274 U.S. 352, 47 S.Ct. 632, 71 L.Ed. 1091 (1927), and International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Later, in McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), the Court upheld California's jurisdiction over an action on a policy insuring the life of a resident brought against a Texas company whose only California "contacts" were mailing into that state a single reinsurance certificate and presumably premium notices, and receiving the signed certificate and premiums in return.

Despite some language emphasizing considerations peculiar to insurance, it would not be difficult to extrapolate from the *McGee* decision and opinion a general principle that the due process clause imposes no bar to a state's asserting personal jurisdiction, of course on proper notice, in favor of a person within its borders who suffers damage from the breach of a contract the defendant was to perform there or a tort the defendant committed there.[5] Once we free our

minds from traditional thinking that the plaintiff must inevitably seek out the defendant, such a doctrine would not seem to violate basic notions of fair play; any view that it does must rest on an inarticulate premise, which a legislature is free to question, that plaintiffs are much more given to making unjust claims than defendants are to not paying just ones. Indeed, when the operative facts have occurred where the plaintiff sues, the convenience of both parties would often be served by a trial there, and the chief benefit to the defendant of a rule requiring the plaintiff to seek him out is the impediment this creates to the bringing of any suit at all. Cf. McGee v. International Life Ins. Co., supra, 355 U.S. at 223–224, 78 S.Ct. 199. Unfairness inconsistent with notions of fair play occurs only when a defendant is "compelled to defend himself in a court of a State with which he has no relevant connection." D. Currie, supra, at 534. And inflicting harm within a state would appear to meet whatever further constitutional requirement may arise from "territorial limitations on the power of the respective States." See Hanson v. Denckla, 357 U.S. 235, 251–254, 78 S.Ct. 1228, 1238, 2 L.Ed.2d 1283 (1958). We would thus perceive no constitutional problem in Connecticut's summoning the New York Post to answer in its courts for a tort—other than defamation—alleged to have been committed in Connecticut upon a Connecticut resident even if that had been a wholly isolated event. See Elkhart Engineering Corp. v. Dornier Werke, 343 F.2d 861 (5 Cir. 1965); Hutchinson v. Boyd & Sons Press Sales, Inc., 188 F.Supp. 876 (D.Minn.1960); Owens v. Superior Court, 52 Cal.2d 822, 829–830, 345 P.2d 921, 924, 78 A.L.R.2d 388 (1959); Nelson v. Miller, 11 Ill.2d 378, 143 N.E.2d 673 (1957); S. Howes Co. v. W. P. Milling Co., 277 P.2d 655 (Okla.1954); Smyth v. Twin State Improvement Corp., 116 Vt. 569, 80 A.2d 664, 25 A.L.R.2d 1193 (1951);[6] contra,

---

5. We do not mean this formulation to be taken as exhaustive.

6. While in many of these cases the defendant or his agent had been within the

state, we do not regard that as crucial. See St. Clair v. Righter, supra, 250 F. Supp. 148; and D. Currie, supra, 1963 U.Ill.L.F. at 549.

Putnam v. Triangle Publications, Inc., supra.

## IV.

The Fifth Circuit has recently held, however, that "First Amendment considerations surrounding the law of libel require a greater showing of contact to satisfy the due process clause than is necessary in asserting jurisdiction over other types of tortious activity", New York Times Co. v. Connor, 365 F.2d 567, 572 (1966).[7] The court did not say just what would be constitutionally sufficient, except that a daily circulation of 395 and a Sunday circulation of 2455, some advertising revenue not calculable from the opinion but apparently small, rare trips to solicit advertising, occasional staff visits, and a few purchases of stories from free-lance writers in the state, were not enough. In so ruling the court followed its earlier decision in Buckley v. New York Times Co., 338 F.2d 470 (5 Cir. 1964), where it had held that the sale in Louisiana of 391 copies of the daily and 1784 of the Sunday Times, together with other activities generally similar to those described above, did not provide sufficient contacts to satisfy due process. The only normative principle we can extract from the opinions is that jurisdiction over an action against an out-of-state newspaper for circulating a libel within the state, even when brought by a resident, cannot be asserted consistently with due process "where the size of his circulation does not balance the danger of this liability". 365 F.2d at 572.[8]

We are not sure whether the law made by these hard cases was good or bad. Newspapers, magazines, and broadcasting companies are businesses conducted for profit and often make very large ones. Like other enterprises that inflict damage in the course of performing a service highly useful to the public, such as providers of food or shelter or manufacturers of drugs designed to ease or prolong life, they must pay the freight; and injured persons should not be relegated to forums so distant as to make collection of their claims difficult or impossible unless strong policy considerations demand. We cannot but wonder whether the Connor court would have felt the same way if the *dramatis personae,* instead of being "Bull" Connor and a newspaper internationally known for its high standards, had been an esteemed local educator or clergyman and an out-of-state journal with a taste for scandal which had circulated 395 copies of a libel stating he had corrupted the morals of the young. Hazards to publishers from libel actions have recently been much mitigated by the development of substantive principles under the First Amendment, notably in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), whose teaching, as we early suggested, Pauling v. News Syndicate Co., 335 F.2d 659, 671 (2 Cir. 1964), cert. denied, 379 U.S. 968, 85 S.Ct. 662, 13 L.Ed.2d 561 (1965), seems likely to be extended at least to candidates for public office and persons like this plaintiff who have projected themselves into public controversy. See Pauling v. National Review, Inc., 49 Misc.2d 975, 269 N.Y.S.2d 11 (Sup.Ct.N.Y. Co. 1966), where the Sullivan principle was successfully invoked against such a public figure by the instant plaintiff and a journal published by him; and Pauling v. Globe-Democrat Publishing Co., 362 F.2d 188 (8 Cir. 1966), where Judge Blackmun reviewed the many recent cases. It is a legitimate question whether this will not sufficiently protect communications media without superimposing a necessarily vague First Amendment standard upon

---

**7.** Although the court was divided, the dissenting judge apparently agreed that mere circulation of the libel of a resident within the state would not have been enough; he based his dissent on the fact that the article in question "arose out of the newsgathering activities" of an agent sent into the state.

**8.** The context makes clear that what the court meant was not liability as such but the added danger of being sued in the state of circulation before "local juries incensed by the out-of-state newspaper's coverage of local events" rather than in the state of publication.

the application of long-arm statutes and thereby possibly creating undue hardship for a plaintiff like our traduced educator or clergyman. Indeed, it is somewhat ironical that in *Connor* itself, after holding that the district court had no jurisdiction, the court of appeals proceeded to exonerate the Times on the merits, ruling that the plaintiff had failed to adduce evidence of malice sufficient to take the case to the jury under the stringent tests laid down in *Sullivan*, 376 U.S. at 279, 84 S.Ct. 710, and *Garrison v. State of Louisiana*, 379 U.S. 64, 74–79, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), as prerequisites of constitutional magnitude.

If, however, mass media should be protected not merely by appropriate substantive defenses to defamation actions but also by procedural rules that will enable them to have burdensome suits dismissed without the necessity of a trial and an appeal, such considerations go not to "jurisdiction" over the defendant, which must exist quite as much when he circulates a libel within a state as when he sends a leaking can of poison there, but to the consistency with the First Amendment's objectives of the state's exercising such jurisdiction in a particular case. The basis for dismissal, in other words, would not be the minimum contacts requirement of the Fourteenth

Amendment due process clause as such, see *Connor*, 365 F.2d at 572; the office served by the Fourteenth Amendment would be simply the making of the First applicable to the states. Such an approach is supported by the line of decisions, stemming from Mr. Justice Brandeis' opinion in *Davis v. Farmers' Co-operative Equity Co.*, 262 U.S. 312, 317–318, 43 S.Ct. 556, 67 L.Ed. 996 (1923), which invalidated judgments against interstate railroads on the ground that requiring them to defend against insufficiently related claims in a forum where no physical operations were conducted would violate the Commerce Clause, whether "jurisdiction" existed or not. Such a distinction [9] has the merit of focusing attention on the facts allegedly creating hardship in each case [10] without mandating a uniform rule that would apply whether the place to which a newspaper is summoned to defend a libel suit is twenty-five or twenty-five hundred miles from the point of publication, as a jurisdictional due process approach that necessarily focuses at least in part on state boundaries might well do. Putting the matter in a slightly different way, the First Amendment could be regarded as giving *forum non conveniens* special dimensions and constitutional

9. The distinction afforded the basis for disregarding earlier cases where "the only constitutional objection asserted was violation of the due process clause", 262 U.S. at 318, 43 S.Ct. at 558, and was carefully preserved in other opinions by Mr. Justice Brandeis on this subject, e. g., *Atchison, Topeka & Santa Fe Ry. v. Wells*, 265 U.S. 101, 44 S.Ct. 469, 68 L. Ed. 928 (1924); *State of Missouri ex rel. St. Louis, B. & M. Ry. v. Taylor*, 266 U.S. 200, 207, 45 S.Ct. 47, 69 L.Ed. 247 (1924); *Hoffman v. State of Missouri ex rel. Foraker*, 274 U.S. 21, 47 S.Ct. 485, 71 L.Ed. 905 (1927); and *Michigan Central R. Co. v. Mix*, 278 U.S. 492, 49 S.Ct. 207, 73 L.Ed. 470 (1929). See also *Denver & Rio Grande Western R. Co. v. Terte*, 284 U.S. 284, 52 S.Ct. 152, 76 L.Ed. 295 (1932). Although talk about lack of "jurisdiction" in this context emerges in *International Milling Co. v. Columbia Transp. Co.*, 292 U.S. 511, 521, 54 S.Ct. 797, 78 L.Ed. 1396 (1934), the Court did not there depart from the approach originally taken; on the contrary it relied on *Taylor* and *Terte* as supplying "the applicable rule," 292 U.S. at 521, 54 S.Ct. 797.

10. This distinction also furnishes an explanation for *Curtis Publishing Co. v. Birdsong*, 360 F.2d 344 (5 Cir. 1966), where the court said, as an alternative holding, that Alabama was "not a constitutionally permissible forum" for a libel action by non-residents against a non-resident publishing company which did not do business in the state but had mailed 69,552 copies of the allegedly offending magazine into it. While it would seem impossible to say that circulation of this magnitude did not confer territorial jurisdiction, exercise of that jurisdiction in favor of non-residents who had suffered no significant harm within the state could be deemed so inappropriate as to violate the First Amendment.

stature in actions for defamation against publishers and broadcasters.

 Once this point is correctly analyzed, the lack of basis for constitutional objection to Connecticut's holding The New York Post to answer Buckley's complaint becomes clear. The Post's daily sales in Connecticut were over four times those of the New York Times in Alabama and Louisiana, which Judge Brown, dissenting in the *Buckley* case, thought enough, 338 F.2d at 475–476. The record affords no ground for a prediction that the added danger of a plaintiff's verdict from having a libel suit by a resident tried in Connecticut rather than in New York—presumably rather slight—would cause the Post to forgo the substantial revenues from these sales and thus deprive Connecticut readers of its news and editorials, as might have been the case if the Times were subjected to repeated libel suits in southern states for articles on racial problems. Beyond this, the Post's argument neglects the many respects in which the southwestern corner of Connecticut and New York City, although divided by a state boundary, are economically and intellectually one.[11] While the Post was unable to determine how many copies are tucked each day under the arms of commuters bound for Greenwich, Stamford, New Canaan and other places in Connecticut, we do not have to shut our eyes to what a trip to Grant Central Station late any afternoon would reveal. The population center of Fairfield County, to which Connecticut was proposing to summon the Post, is only 40 miles from the Empire State Building, and a goodly number of its adult males make the trip to New York City every working day.[12] For us to say that although the First Amendment would not protect the Post against having to answer a defamed Buffalonian in Buffalo or a Plattsburgher in Plattsburgh, the existence of a state border permits it to invoke the First Amendment as a bar to having to defend a libel suit by a Fairfielder in Fairfield County, Connecticut, would substitute formalism for the reality that should be requisite before a court applies the Amendment so as to forbid a state's exercising a jurisdiction over a non-resident that it could do in the case of any other tort.

The order dismissing the complaint for want of jurisdiction over the defendant is reversed.

MEDINA, Circuit Judge (concurring):

I concur in my brother Friendly's excellent and well reasoned opinion except that I would leave the decision of whether newspapers are "goods" within the meaning of subdivision (3) of Connecticut's long-arm statute to the Connecticut courts in the first instance. This is a highly controversial subject and the holding that the copies of the Post distributed or carried into Connecticut are "goods" within the meaning of the statute is not necessary to our decision that personal jurisdiction over the defendant has been established. I prefer not to interpret the statute in this respect until we have the benefit of the views of Connecticut courts, which may be informed of or have access to materials indicative of the intention of the Connecticut Legislature that are not available to us, or until we are faced with no other alternative.

Moreover, I am not shocked to see the principles embedded in the First Amendment applied to the expanding subject of jurisdiction over the person. Nor would I temporize by suggesting that this is some sort of venue or forum non con-

11. See generally Hoover and Vernon, Anatomy of a Metropolis (1959), "This book is concerned with 6,914 square miles of real estate, covering 22 counties in three states and supporting nearly 7 million jobs and about 16 million people—an area we have termed the New York Metropolitan Region." P. 3. "To many of these people," including the inhabitants of Fairfield County, "the Core of the New York Metropolitan Region offers jobs or a cultural or social base." P. 20.

12. Hoover and Vernon, supra, pp. 8, 300–301. The authors estimate that over 10% of the working population of Fairfield County, 23,800 out of 222,100, are employed in New York City.

veniens problem. To me this adds an element of unnecessary confusion. It is much better to have new doctrines develop slowly if they are truly to serve the ends of justice. In this case I am in complete agreement with my brothers in holding that no First Amendment implications prevent the application of the Connecticut long-arm statute to a New York newspaper in favor of a resident of Fairfield County, Connecticut, in an action in Connecticut for defamation, based upon a publication in New York, distributed to commuters and others so near New York City as to be practically in a part of the metropolitan area.