Hillsborough,
No. 5230.

ALPHONSE ROY

*v.*

NORTH AMERICAN NEWSPAPER ALLIANCE, INC. &a.

Argued September 10, 1964.
Decided December 30, 1964.

*McLane, Carleton, Graf, Greene & Brown, G. Peter Guenther* and *Bois & Laflamme* (*Mr. Guenther* orally), for the plaintiff.

*Devine, Millimet, McDonough, Stahl & Branch* and *E. Donald Dufresne* (*Mr. Joseph A. Millimet* orally), for the defendant North American Newspaper Alliance, Inc.

KENISON, C.J. The basic question in this case is whether it is consistent with due process to hold that the defendant foreign corporation is amenable to the judicial jurisdiction of this state by substituted service on the Secretary of State pursuant to RSA 300:11, 12. The pertinent part of RSA 300:11(c), which was enacted by Laws 1949, c. 206, provides that the Secretary of State is authorized to accept service on any foreign corporation "transacting business in this state." See Uniform Interstate and International Procedure Act, s. 1.03(a) (1) and Commissioners' note in 9B Uniform Laws Annotated 75 (1963 supp.). A capsule summary of some of the decisions in this jurisdiction are relevant to an understanding of the development of "judicial jurisdiction over a foreign corporation as to causes of action

arising out of . . . an act done, or caused to be done, by the corporation in the state or resulting in consequences there. . . ." Restatement (Second), Conflict of Laws, *s.* 91a (Tent. draft No. 3, 1956).

More than a century ago when the jurisdiction over foreign corporations was minimal in *Libbey* v. *Hodgdon,* 9 N. H. 394 (1838), this court "took the bold step" of allowing a suit against a Maine corporation under a statute which did not expressly include foreign corporations. Henderson, The Position of Foreign Corporations in American Constitutional Law 82 (1918). In the *Libbey* case, *supra,* at 396 the court reasoned as follows: ". . . If, upon principles of law or comity, corporations created in one jurisdiction are allowed to hold property and maintain suits in another, it would be strange indeed if they should not also be liable to be sued in the same jurisdiction. If we recognize their existence for the one purpose, we must also for the other. If we admit and vindicate their rights, even-handed justice requires that we also enforce their liabilities; and not send our citizens to a foreign jurisdiction in quest of redress for injuries committed here."

Under the paralyzing effect of *Pennoyer* v. *Neff,* 95 U. S. 714, and its successors this court faithfully but unhappily followed the federal decisions as to what constituted doing business by a foreign corporation. Thus in *Campbell* v. *Corporation,* 86 N. H. 310, 311 (1933), it was noted that the "presence" of a foreign corporation "is as indubitably shown by a single act as by many transactions. But we have no concern with the adequacy or correctness of the reasons given for a rule of federal constitutional law." In that case we followed *International Harvester Co.* v. *Kentucky,* 234 U. S. 579, 585 and *Bank of America* v. *Bank,* 261 U. S. 171, noting "It is not the function of the state court to review the adequacy of the supporting logic."

When the shackles were loosened by *International Shoe Co.* v. *Washington,* 326 U. S. 310, 316, and the Supreme Court discarded the theories of constructive presence and implied consent in favor of a test which emphasized minimum contacts with the State so that the assumption of jurisdiction did not offend "traditional notions of fair play and substantial justice," this court adopted the rationale of that case without limitation. See *Grace* v. *Company,* 95 N. H. 74, 76 (1948) where it was stated

that the *International Shoe* decision "indicated that the problem of jurisdiction over foreign corporations will hereafter be treated more realistically." See also, *Taylor* v. *Company*, 97 N. H. 517 (1952). Some significance may be attached to the fact that after the *Grace* case the Legislature at its next session in 1949 enacted RSA 300:11(c), providing that service of process could be made on the Secretary of State for any foreign corporation "transacting business in this state." In *LaBonte* v. *Company*, 98 N. H. 163 (1953) a foreign publishing corporation was held amenable to service under this statute in a libel action where the printing and distribution of its magazine by a domestic corporation was done on its behalf in this state. 2 Hornstein, Corporation Law and Practice, *s.* 584, note 7 (1959).

The New Hampshire statute has been interpreted as ". . . exerting jurisdiction over foreign corporations up to the constitutional limit." *Elliott & Sons Co.* v. *Nuodex Products Co.,* 243 F. 2d 116, 124 (1st Cir. 1957). This view of the New Hampshire statute is correct and was adhered to in *Sanders Associates* v. *Galion Iron Works & Mfg. Co.*, 304 F. 2d 915, 919 (1st Cir. 1962), where the court stated that the objective of the New Hampshire statute was ". . . to exercise jurisdiction to the full extent of the constitutional limit." See also, *Benson* v. *Brattleboro Retreat*, 103 N. H. 28, 30. It is thus clear that RSA 300: 11 (c), as heretofore construed and applied, has a long arm and a long reach. ALI, Study of the Division of Jurisdiction Between State and Federal Courts 70-71 (Tent. draft No. 1, 1963); Cardozo, The Reach of the Legislature and the Grasp of Jurisdiction, 43 Cornell L. Q. 210 (1957).

The Pearson column was received by teletype by the defendant in its New York office where it was stenciled and mimeographed and shipped to subscribing newspapers on the East Coast. The promotion, distribution and sales of the defendant's news features to newspapers in New Hampshire were conducted almost exclusively by mail and less frequently by telephone. Its promotional material was forwarded in the same manner. During the period from August 1959 to November 1962, the date of the hearing, the defendant sent promotional material to the majority of daily newspapers in this state. The defendant acted as agent for authors and artists and its duties were to sell the particular feature for the author and make an accounting

to him. The only visits made to New Hampshire by defendant's salesmen were one made in 1956 and another for an unknown purpose in 1959.

Under the contract between the defendant and the columnist Pearson the defendant agreed to "devote its best efforts to secure newspaper publication of the column throughout the world." Under the contract Pearson gave the defendant "the exclusive first publication rights thereto in newspapers throughout the world" and agreed not to release anything for publication without the permission of the defendant. Under this contract Pearson agreed to indemnify the defendant against damages arising out of libel and other legal liabilities. Pearson was paid a guaranteed amount plus a percentage of the revenue from sales to newspapers by the defendant.

The defendant contends "that there is a tradition against taking jurisdiction over foreign publishers based on alleged libels unless there is a very substantial and continuous activity by the publisher in the forum state." Annot. 38 A.L.R. 2d 747. *Insull* v. *New York World-Telegram Corporation*, 273 F. 2d 166 (7th Cir. 1959); *Walker* v. *General Features Corporation*, 319 F. 2d 583 (10th Cir. 1963). One able commentator in the field of conflict of laws has suggested that "*Insull* must go" and has submitted the following arguments: "An Illinois resident claimed to have been harmed by articles mailed into Illinois by defendants. The Illinois libel laws are clearly designed to protect Illinois residents against defamation; Illinois has an interest in applying those laws in such a case. It is no more unfair to subject a newspaper publisher than a valve maker [*Gray* v. *American Radiator & Sanitary Corp.*, 22 Ill. 2d 432] to suit here when both have deliberately caused their wares to be consumed in Illinois. It is no answer that only a relatively few copies of the papers in *Insull* were sent into this State; one copy is enough to damage a reputation and to constitute a tort. Consideration of libel cases tends to become befogged by thoughts of press freedom . . . But a defendant who has received an unfair trial is entitled to a reversal on grounds of due process . . . Assuming, as the Supreme Court has held, that there are libel laws which do not infringe the freedom of the press [*New York Times Co.* v. *Sullivan*, 376 U. S. 254; *Garrison* v. *Louisiana*, 85 S. Ct. 209 (No. 4, decided November 24, 1964)] it is difficult to understand why a State in which libels

are circulated should lack power to enforce those laws for the protection of its residents." D. Currie, The Growth of the Long Arm: Eight Years of Extended Jurisdiction in Illinois, 1963 U. Ill. L. F. 533, 553-554 (1964).

If a defendant, whether an individual or foreign corporation, negligently shoots a bullet from state X into state Y, or while engaged in blasting operations in state X causes a stone to be hurled into state Y causing damage, we do not seriously question the right of the injured person to seek redress in state Y and exercise judicial jurisdiction over the defendant in state Y. Restatement (Second), Conflict of Laws, s. 84, *comment* d, ill. 3 (Tent. draft No. 3, 1956); Reese & Galston, Doing An Act Or Causing Consequences As Bases of Judicial Jurisdiction, 44 Iowa L. Rev. 249, 261-262 (1959). The decision in *McGee* v. *International Life Insurance Co.,* 355 U. S. 220, although limited by *Hanson* v. *Denckla,* 357 U. S. 235, indicates that an insurance company which solicits through the mails is subject to the jurisdiction of the state over causes of action arising out of the policy even though it sends no agents into the state to solicit the policy and present premium notices to the insured. "A state has a natural interest in the consequences of an act which take place within its territory even though the act itself was done elsewhere." Restatement (Second), Conflict of Laws, s. 84, *comment* d (Tent. draft No. 3, 1956). "While no one recently seems to have stood in one state and fired a gun at a human target across the state line, currently we do find jurisdiction over nonresidents in civil damage cases based on such out-of-state activities as sending dangerous or defective products into the state and broadcasting defamatory statements received within the state." Cleary, The Length of the Long Arm, 9 J. Pub. L. 293, 300 (1960).

A basic principle of reasonableness is the foundation of any exercise of jurisdiction by a state. *Nelson* v. *Miller,* 11 Ill. 2d 378. In the present case this state has an interest in protecting its citizens against defamation. Note, Developments in the Law, State-Court Jurisdiction, 73 Harv. L. Rev. 909, 928, 930 (1960). The plaintiff is not "forum shopping" but seeks redress in the community and state where he lives and works. *Cf. Arrowsmith* v. *United Press International,* 320 F. 2d 219, 221 (2d Cir. 1963). The defendant could reasonably anticipate that the sale, distribution and promotion of the Pearson column and other

news features might entail libel actions as its contract with Drew Pearson providing for indemnification attests. Granting that freedom of press is a most important consideration, so long as malicious defamation remains a tort, it should be given constitutional protection even in its present limited and attenuated context. *New York Times Co.* v. *Sullivan*, 376 U. S. 254; *Garrison* v. *Louisiana*, 85 S. Ct. 209 (No. 4, decided November 24, 1964). While not conclusive, the equities and convenience of trial designate this state as a just and fair forum because its law applies and because the crucial witnesses will for the most part be from within this state. Restatement (Second), Conflict of Laws, *s.* 379d and *s.* 379e(2), (Tent. draft No. 9, 1964); *WSAZ, Inc.* v. *Lyons*, 254 F. 2d 242 (6th Cir. 1958). For many years the defendant for pecuniary benefit has promoted the sale of its services and news features to a majority of the daily newspapers in this state. Logically and commercially we cannot say that it offends fair play and substantial justice to require the defendant to defend in our courts a New Hampshire libel action by a New Hampshire resident based on an alleged defamatory column distributed for publication by the defendant and published in this state.

In order that conflict of laws in the twentieth century does not develop the rigor mortis that set in with *Pennoyer* v. *Neff*, 95 U. S. 714, it is important that we do not unnecessarily erect constitutional fictions and barriers "for snarling up law suits against foreign corporations" and defeating the practical administration of justice. Ehrenzweig, Conflict of Laws, *s.* 33, *p.* 119 (1962). We recognize that "Hanson v. Denckla [357 U. S. 235] teaches that, although the door of non-resident jurisdiction has been open wider by *International Shoe* [326 U. S. 310] and *McGee* [355 U. S. 220], it has not been removed from its hinges . . . ." *Dooly* v. *Payne*, 326 F. 2d 941, 943 (5th Cir. 1964). Nevertheless, we think that it is reasonable and consistent with due process to hold that the defendant is subject to the judicial and legislative jurisdiction of New Hampshire pursuant to RSA 300:11(c).

*Remanded.*

All concurred.