John FOYE

v.

**CONSOLIDATED BALING MACHINE COMPANY.**

Supreme Judicial Court of Maine.

May 9, 1967.

Smith & Elliott, by Charles W. Smith, Saco, for appellant.

Verrill, Dana, Walker, Philbrick & Whitehouse, by John W. Philbrick, Portland, for appellee.

Before WILLIAMSON, C. J., and WEBBER, TAPLEY, MARDEN and DUFRESNE, JJ.

WEBBER, Justice.

■ This case requires an interpretation of 14 M.R.S.A. Sec. 704(1), our so-called "long arm" statute originally enacted as P.L.1959, Ch. 317, Sec. 125. As applicable to the facts of the instant case the statute subjects a nonresident "to the jurisdiction of the courts of this State as to any cause of action arising from * * * B. The commission of a tortious act within the State *resulting in physical injury to person or property*". (Emphasis ours) This statute was borrowed with only slight change from the Illinois "long arm" statute (R.S. Ch. 110, Par. 17). The change referred to is found in the addition of the italicized words, "resulting in physical injury to person or property", not found in the Illinois statute. "In Nelson v. Miller, (1957) 11 Ill.2d 378, 143 N.E.2d 673, the Illinois Supreme Court said that the Illinois long arm statute upon which the Maine act was based reflected 'a conscious purpose to assert jurisdiction over nonresident defendants to the extent permitted by the due process clause.' As stated in the Text, it is a principle of statutory construction that when a statute has been directly taken from that of another state, it is assumed that the Maine Legislature was familiar with the interpretative rulings previously made by the courts of that state and intended to adopt them. When the Maine statute was under consideration by the Legislature, Nelson v. Miller was cited to the Judiciary Committee, which strengthens the presumption that the broad interpretation there set forth was intended to be a guide to the Maine courts." Field & McKusick, Maine Civil Practice, 1967 Supp., page 20. We are satisfied as were these text writers that the Legislature intended to fashion a "long arm" statute of maximum permissible reach "to the extent permitted by the due process clause."

■ In the case before us the complaint charged the nonresident defendant as manufacturer and vendor of a dangerous and defective paper press. It charged defendant with knowledge of defects and failure to warn. Plaintiff was alleged to have been injured as a result of these defects while operating the machine in Maine. Service was made on defendant in New York. Defendant appeared specially and filed motion to dismiss on jurisdictional grounds. An affidavit filed in support of the motion showed that defendant was vendor but not manufacturer of the paper press, that it purchased the machine from the manufacturer and sold it to a Massachusetts company and that upon the order and request of the purchaser the defendant shipped the machine directly to the plaintiff's employer in Maine. Wherever there is inconsistency as between the allegations of the pleadings and the facts stated by affidavit, the affidavit controls for the purpose of determining the motion. Sawyer v. Congress Square Hotel Co., (1961) 157 Me. 111, 114, 170 A.2d 645. It is not disputed that defendant maintained no office or employees within this State, transacted no other business here, and jurisdiction must rest if at all, on this single transaction.

■ In our view a vendor who by direct shipment places a dangerous instrumentality in the hands of a citizen of this State where it can and subsequently does cause injury thereby commits a "tortious act" within this State, at least within the broad interpretation which we have said should be given to the "long arm" statute. In discussing the New Hampshire "long arm" statute which has also been interpreted as "exerting jurisdiction over foreign corporations up to the constitutional limit", Kenison, C. J. said in Roy v. North American Newspaper Alliance, Inc., (1964) 106 N.H. 92, 205 A. 2d 844, 847: "If a defendant, whether an individual or foreign corporation, negligently shoots a bullet from state X into state Y, or while engaged in blasting operations in state X causes a stone to be hurled into state Y causing damage, we do not seriously question the right of the injured person to seek redress in state Y and exercise judicial jurisdiction over the defendant in state Y. * * * 'While no one recently seems to

have stood in one state and fired a gun at a human target across the state line, currently we do find jurisdiction over nonresidents in civil damage cases based on such out-of-state activities as sending dangerous or defective products into the state and broadcasting defamatory statements received within the state.' Cleary, The Length of the Long Arm, 9 J.Pub.L. 293, 300 (1960)." This dictum suggests to us the concept of what we may term the continuing act. For jurisdictional purposes from the time the dangerous instrumentality set in motion by the defendant enters the State and while it proceeds within the State to the point of injurious- contact with the plaintiff, the defendant may properly be deemed to be "acting" within the State.

In Gray v. American Radiator & Standard Sanitary Corp., (1961) 22 Ill.2d 432, 176 N.E.2d 761, 763 the nonresident defendant supplied a defective safety valve to the manufacturer of a water heater outside of Illinois. The defendant had no further dealings with the heater which in the course of commerce was sold to an Illinois consumer. It exploded in Illinois and injured the plaintiff. Defendant had no other contacts with Illinois. As already noted, under Illinois law jurisdiction is asserted over a nonresident who "commits a 'tortious act' within this State." The court reasoned that the resulting injury was an inseparable part of the whole tort and was itself a "tortious act" within the meaning of the statute. As justification for its very liberal interpretation of the phrase "tortious act within this State", the court said: "We think the intent should be determined less from technicalities of definition than from considerations of general purpose and effect. To adopt the criteria urged by defendant would tend to promote litigation over extraneous issues concerning the elements of a tort and the territorial incidence of each, whereas the test should be concerned more with those substantial elements of convenience and justice presumably contemplated by the legislature. As we observed in Nelson v. Miller, 11 Ill.2d 378, 143

N.E.2d 673, the statute contemplates the exertion of jurisdiction over nonresident defendants to the extent permitted by the due-process clause."

We recognize that the difference in wording between the Illinois statute and the Maine statute would make it difficult for us to apply the reasoning relied upon in Gray. As above noted, our statute adds after the words "[t]he commission of a tortious act within the State" the words "resulting in physical injury to person or property." This suggests rather clearly that the "tortious act" must be antecedent to and productive of the resulting injury. We therefore confine our result to the facts of this case and the situation in which the defendant has himself sent the dangerous instrumentality directly into this State. We neither intimate nor suggest what our holding would be where as in Gray the defendant has had no contact with this State prior to or apart from the resulting injury.

The New York court, interpreting the identical phrase construed in Gray, declined to follow the Illinois court. The case reported as Longines-Wittnauer W. Co. v. Barnes & Reinecks, Inc., (1965) 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68, 77, 81, 84 is in fact a trilogy of cases decided together, two of which are of interest here. In the second of these cases, Feathers v. Lucas, the nonresident defendant manufactured an allegedly defective steel tank which it sold to another nonresident outside of New York. While the tank was being transported by the ultimate purchaser within New York, it exploded, injuring the New York plaintiff. A divided court was satisfied that the New York statute, properly construed, did not assert jurisdiction under these circumstances. The court said: "The language * * * 'commits a tortious act *within* the state'—is too plain and precise to permit it to be read * * * as if it were synonymous with 'commits a tortious act *without* the state which causes injury within the state.' The mere occurrence of the injury in this State certainly cannot serve to transmute an out-of-state

tortious act into one committed here within the sense of the statutory wording."

In the third case of the trilogy, Singer v. Walker, the court flatly repudiated the theory which we here adopt. For in Singer the nonresident manufactured a defective geologist's hammer which it shipped directly to a New York dealer. It was then acquired by plaintiff who was injured in Connecticut. The court said: "Manifestly, the tortious acts attributed to the appellant in the manufacture and labeling of the hammer occurred at the place of manufacture in Illinois and, as in Feathers, are wholly insufficient to satisfy the requirement * * * that the 'tortious act' be one committed 'within' this State. The Appellate Division, nevertheless, sustained jurisdiction on the theory that (defendant's) 'circulation' in New York of a hammer mislabeled as unbreakable—thereby creating as that court put it, a continuing condition of hazard wherever the article was sold— itself constituted the commission of a tortious act here. We cannot accept this reasoning. The mere fact that a product defectively manufactured and misleadingly labeled in one state is marketed and sold in another cannot serve to change the place where the original tortious acts were committed or to create a new tortious act." The New York court went on to sustain jurisdiction on the basis of other business transacted by the defendant within the State.

Desmond, C. J. was unable to agree with the New York court's understanding of what may constitute a "tortious act within the state." He said in part: "For instance, the totality of an actionable tort such as is charged here (involving manufacturer's products liability) consists of three elements: defective manufacture, distribution to purchaser, and a resulting injury. Each of these is a 'tortious act' or, in other words, a 'part of a tort'. * * * How it can be factually or conceptually, that (defendant) committed no 'tortious act' in this State *when, directly and without intervening vendors or distributors, it sent the mislabeled and defective hammer into New*

*York* for sale is beyond my understanding. True, the whole tort was not committed here since the manufacture and the origin of the shipment were in Illinois and the resulting physical injury was in Connecticut, but a tortious act in New York is nevertheless spelled out plainly in these papers." (Emphasis ours)

We have examined the decisions of courts in other states which subject the nonresident defendant to jurisdiction in single tort cases, but in each instance the wording of the jurisdictional statute is significantly different from our own. See for example Metal-Matic, Inc. v. Eighth Judicial District Court, (Nev. 1966) 415 P.2d 617 (product has caused "injury * * * in this state"); Phillips v. Anchor Hocking Glass Corporation, (1966) 100 Ariz. 251, 413 P.2d 732 (" 'has caused an event to occur in this state out of which the claim which is the subject of the complaint arose' "); Atkins v. Jones & Laughlin Steel Corporation, (1960) 258 Minn. 571, 104 N.W.2d 888 (" 'commits a tort in whole or in part in Minnesota' ").

We go no farther than the facts of this case. We treat the defendant who makes the intentional direct shipment of the dangerous and injury producing product to the consumer as "acting" within the forum state. We conclude that the papers in this case sufficiently allege that the defendant committed a "tortious act within this State" within the meaning and intendment of 14 M.R.S.A. Sec. 704(1).

The defendant here contends that if the statute be so construed, the subjection of the defendant to the jurisdiction of the Maine courts under the circumstances of this case would constitute a deprivation of due process of law. We cannot agree. The modern rule was first announced in International Shoe Co. v. State of Washington, Etc., (1945) 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, wherein the Supreme Court said: "But now that the capias ad respondendum has given way to personal service of summons or other form of no-

tice, due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" In McGee v. International Life Insurance Co., (1957) 355 U.S. 220, 222, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 the court held that a *single transaction* could under appropriate circumstances satisfy the "minimum contacts" requirement. Moreover, it cited with apparent approval Smyth v. Twin State Improvement Co., (1951) 116 Vt. 569, 80 A.2d 664, 25 A.L.R.2d 1193, in which the Vermont court held a *single tort* satisfied the "minimum contacts" test. Mr. Justice Black, speaking for a unanimous court in McGee, said: "Looking back over this long history of litigation a trend is clearly discernable toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents. In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity."

Although sounding a note of caution, the court in Hanson v. Denckla, (1958) 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed. 2d 1283 gave no indication that it had enlarged the requirements with respect to "minimum contacts". On the contrary, the court said: "The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case *that there be some act* by which the defendant *purposefully avails*

*itself* of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." (Emphasis ours)

As already noted, we attach some importance to the fact that the defendant in the case before us made a direct shipment of the machine to a Maine consumer. So also did the Vermont court in O'Brien v. Comstock Foods, Inc., (1963) 123 Vt. 461, 194 A.2d 568, 570. There the offending commodity was merely placed by the defendant "in the stream of commerce" in New York and ultimately found its way into the hand of the Vermont plaintiff. The court was not convinced that due process was satisfied and personal jursidiction failed. It said: "The vital factor in the statute is the intentional and affirmative action on the part of the non-resident defendant in pursuit of its corporate purposes within this jurisdiction. A single act, purposefully performed here, will put the actor within the reach of the sovereignty of this state, as in the Smyth case. So will active participation in the Vermont market, *either by direct shipment,* or by way of transmittal through regular distributors presently serving the Vermont marketing area." (Emphasis ours)

We are satisfied that, giving consideration to the nature of defendant's alleged activity in this State and the relative convenience and protection of the parties if Maine be the forum for trial, maintenance of the suit in this State will not offend "traditional notions of fair play and substantial justice."

The motion to dismiss having been granted below, the entry here will be

Appeal sustained.

Motion to dismiss denied.

Remanded to Superior Court for further proceedings not inconsistent with this opinion.

RUDMAN, J., did not sit.