**Gordon NOVEL, Plaintiff,**

v.

**Jim GARRISON and HMH Publishing Co., Inc., a Delaware corporation, Defendants.**

**No. 67 C 1895.**

United States District Court
N. D. Illinois, E. D.

Jan. 2, 1969.

Elmer Gertz, Chicago, Ill. (for the Plaintiff)

Sheldon Karon, Stephen C. Shamberg and Friedman, Koven, Salzman, Koenigsberg, Specks & Homer, Chicago, Ill. (for Defendant Garrison)

Deutsch, Kerrigan & Stiles, New Orleans, La. (for Defendant Garrison)

David J. Krupp, Devoe, Shadur, Mikva & Plotkin, Chicago, Ill. (for Defendant HMH Publishing Co.)

## MEMORANDUM AND ORDER

CAMPBELL, Chief Judge.

This is a libel action brought by plaintiff, a citizen of Ohio, against defendants Jim Garrison, a citizen of Louisiana, ("Garrison") and HMH Publishing Co., Inc., ("HMH") a corporation incorporated under the laws of Delaware and having its principal place of business in the state of Illinois. Defendant Garrison is the elected District Attorney of Orleans Parish, Louisiana. Defendant HMH is publisher of a widely circulated magazine known as Playboy. The cause of action alleged herein grows out of an interview given by defendant Garrison to the HMH Publishing Co. and regard-

ing his widely publicized investigation into the assassination of President John F. Kennedy. The interview resulted in a lengthy article which was published in Playboy Magazine and which plaintiff alleges was libelous. Defendant HMH does not question the jurisdiction of this court and has filed its answer to plaintiff's complaint. Defendant Garrison has filed a motion to dismiss in which he argues that this court lacks jurisdiction over his person and also that the case should be dismissed for improper venue.

In support of his motion to dismiss, defendant Garrison has filed an affidavit stating that prior to June 24, 1967 Mr. Mark Lane, an attorney and author, asked Garrison if he would grant an interview to Eric Norden, a free lance writer, for publication in Playboy Magazine. Garrison met with Norden in New Orleans and later communicated with him by telephone while Norden was in Brooklyn, New York. At no time was Garrison personally present in the state of Illinois in connection with the interview which is the subject matter of this action. Garrison further states that he has not been in Illinois more than twice in the past 40 years and not at all in the past two years. Garrison received no payment for the article printed in Playboy.

Before publication of the article, Garrison learned that Playboy's principal office was in Chicago.[1] In fact, he received a number of telephone calls from Playboy's Chicago office with reference to the interview. It is clear from a reading of all the pleadings, affidavits and answers to interrogatories filed herein that at the time of publication Garrison knew that the interview would be printed and published by HMH in Playboy Magazine in Chicago, Illinois, and be distributed from Chicago throughout the state of Illinois as well as many other states.[2] Galley proofs of the interview had been sent to Garrison from Chicago and upon receipt Garrison made notations and changes and returned the proofs to Playboy's office in Chicago.[3] Defendant Garrison participated in numerous and lengthy telephone calls with the Playboy office in Chicago dealing with the subject matter, form and content of the interview. Various documents and memoranda were also exchanged by mail.[4]

The interview appeared in Playboy's issue of October, 1967. There were apparently seven editions [5] of that issue, all edited and printed in Chicago, Illinois, and either delivered here to the post office for mailing or to various carriers for shipment to local points of distribution. Only the central edition is distributed in Illinois. Five of the six editions, other than the central edition, were placed on sale at newsstands and mailed to subscribers at least seven days before they were available to subscribers or purchasers in Illinois. More than sixty per cent of the copies were thus placed on sale at newsstands outside Illinois and mailed to subscribers outside Illinois a week before any copies were placed on sale in Illinois or mailed to Illinois subscribers.

---

1. Answers to additional interrogatories propounded to defendant Garrison, filed Jan. 30, 1968 (Interrogatory No. VIII(A).)

2. In its answer (par. 5) HMH states " * * * at the time of such interview defendant Garrison intended that said interview be printed and published by HMH in Playboy magazine in Chicago, Illinois and distributed throughout the State of Illinois. Garrison states (Interrogatory VIII(b) filed Jan. 30, 1968) he had " * * * intent whatever one way or the other in this regard. Playboy asked for an interview and I gave them one." From his knowledge of Playboy's activities in Chicago, it must be concluded that Garrison intended that the interview be printed and published here.

3. HMH answers to interrogatory No. 9(b).

4. HMH answers to interrogatory No. 14 (b).

5. Editions: Central; Western; Eastern; California; Northeastern; Military; and European.

Garrison also appeared on various television shows originating in New York, but carried into Illinois. A newspaper, National Insider, which is edited, printed and published in Illinois, carried a number of articles dealing with the Garrison investigation. One of the articles was by-lined "Jim Garrison"[6]. Garrison denies that any of these articles were written with his authorization.[7] In any event, these articles are not the subject matter of this suit. Plaintiff relates their existence only to illustrate, for jurisdictional purposes, Garrison's contacts with Illinois.

Plaintiff argues that Garrison is subject to the jurisdiction of this court because by the above activities he has within the meaning of the Illinois "long arm" statute,[8] either (a) transacted business in Illinois;[9] or (b) committed a tortious act within this state.[10]

## DOING BUSINESS

 It is the contention of plaintiff that the Playboy article and the many other articles and television appearances taken together constitute the "transaction of business" within the meaning of the Illinois Act. Garrison, in turn argues that the various articles (other than the Playboy interview) and the television appearances have no bearing on the jurisdictional issue, "since long-arm jurisdiction may be based only on the transactions from which the claim arose."[11] While I do not necessarily agree that to assert jurisdiction under the Illinois Act a claim must be related to defendants activities within the state, (Gordon v. International Tel. and Tel. Corp., (N.D.Ill., 1967) 273 F.Supp. 164, I do find from all of the facts that even under the liberal interpretation generally afforded the Illinois Act, Garrison was not transacting business or engaged in any business transaction in Illinois. (See Koplin v. Saul Lerner Co. Inc., 52 Ill.App.2d 97, 201 N.E.2d 763 (1964)).

## THE COMMISSION OF A TORTIOUS ACT

Plaintiff next argues that by sending the alleged libelous article into Illinois to be edited, printed and published here, and by his participation in that editing and publishing by phone and by mail, Garrison has committed a tortious act within this state. Defendant argues that no tortious act was committed in Illinois because an essential element of the alleged libel—the publication—occurred elsewhere.[12] And, the "single publication" rule, as interpreted by the Illinois courts, limits the place of the tort to the state where it was first published. Garrison further argues that, even were the tort committed here, because this is a libel action certain "First Amendment considerations" prohibit the court from exerting jurisdiction over his person.

## THE ILLINOIS LONG-ARM STATUTE

 A discussion of the historical setting of the Illinois long-arm statute appropriately starts with International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), wherein the United States Supreme Court established the now well settled principle that certain minimum contacts with a state may subject the actor to the jurisdiction of the courts of that state. On the impetus of *International Shoe* the Illinois legislature enacted § 17 of the Civil Practice Act. The Supreme Court of Illinois in construing the breadth of the Illinois Act has concluded that it was

6. Affidavit of Elmer Gertz, filed Feb. 16, 1968. A number of additional "contacts" are related in the Supplemental Brief of Plaintiff filed March 14, 1968.

7. Affidavit of Garrison, filed March 4, 1968.

8. Ill.Rev.Stat.C. 110 § 17.

9. Id. § 17(1)(a).

10. Id. § 17(1)(b).

11. Reply Brief of defendant Garrison, filed March 4, 1968.

12. The October issue of Playboy first went on sale, and was first delivered to subscribers in states other than Illinois. (Affidavit of Robert S. Preuss, filed January 9, 1968).

the intent of the Illinois legislature in adopting § 17 to expand the *in personam* jurisdiction of its courts to the limits permitted under the due process clause of the Fourteenth Amendment. (Nelson v. Miller, 11 Ill.2d 378, 143 N.E.2d 673 (1957)). The reach of the tortious act provision was realized in Gray v. American Radiator and Standard Sanitary Corporation, 22 Ill.2d 432, 176 N.E. 2d 761 (1961). In *Gray*, an Ohio manufacturer sold a valve to an assembler in Pennsylvania where it was incorporated in a water heater which was eventually shipped into Illinois where it exploded, injuring plaintiff a resident of Illinois. The Court held that the Ohio manufacturer was subject to the jurisdiction of Illinois. In later cases, the Illinois courts have continued the ambitious policies of *Gray* and have exerted jurisdiction on the most minimal of contacts. (See Ziegler v. Hodges, 80 Ill.App.2d 210, 224 N.E.2d 12 (1967); Koplin v. Thomas, Haab & Botts, 73 Ill.App.2d 242, 219 N.E.2d 646 (1966)).

Were this a defective valve case instead of a libel action it could be concluded without question that the Illinois act anticipates the exertion of jurisdiction under the circumstances presented here. Defendant Garrison fully knew and understood that his product was being "shipped into Illinois" and that if libelous it could cause injury in Illinois. The facts of this case are thus much stronger than those in *Gray*. Compare and consider the relative forseeability in *Gray* with this case where Garrison actually sent the alleged libel into Illinois and knew that the material he sent to Illinois would be edited and printed here and eventually shipped from this jurisdiction to the many points of distribution throughout the country. It is argued, however, that because this is a libel case other considerations are brought to bear, which require a contrary result.

## SINGLE PUBLICATION RULE

Garrison argues that under the Illinois version of the single publication rule, "the tort of libel by a newspaper or magazine is committed at the time and place of first publication, which occurs when the periodical first goes on sale to the public or first reaches its subscribers". Thus in this case " * * * the interview was first published when Playboy's October-1967 issue went on sale and reached subscribers outside of Illinois." To support this position Garrison cites and relies on the decision of the Seventh Circuit Court of Appeals in Insull v. New York World Telegram Corp., 273 F.2d 166 (1959) and concludes, "under the Insull holding, any tort involved was therefore committed outside of Illinois."

To respond to Garrison's position it is necessary to review the background of the single publication rule and its application by the courts of Illinois.

Under the pure common law rule every communication of a libelous statement may give rise to a separate cause of action. Therefore, every sale of every copy of a newspaper or magazine is a separate publication and separate basis for liability.[13] Literal application of the rule made possible the notorious case of Duke of Brunswick v. Harmer (Q.B.1849) 117 Eng.Rep. 75. In that case, the Duke, learning of a libel printed eighteen years earlier, sent his servant out to the printer to purchase a back copy of the newspaper. After the purchase by his servant, the Duke brought an action for libel. The English court held that when the servant purchased the newspaper he caused a new and fresh publication of the libel, thus giving rise to a new cause of action and successfully circumventing the otherwise applicable statute of limitations. The injustice of the *Duke of Brunswick* rule is apparent. Apart from the statute of limitations problems its multiple publication principle is completely impractical in this age of mass communication. The case before me is

---

13. Prosser, Interstate Publication, 51 Mich.L.Rev. 958, 961 (1953); See Authorities cited therein at note 14.

a perfect example: Playboy is circulated in all 50 states and the District of Columbia as well as abroad; 5,363,293 copies of the October 1967 issue were distributed. Were the multi-publication rationale of the *Duke of Brunswick* case to be applied strictly, each sale in every jurisdiction would give rise to a separate cause of action.

■ To assure an effective statute of limitations and to avoid the hardship and injustice that would result from multi-actions, the single publication rule was developed and is applied in some form or other in almost every American jurisdiction. (Prosser, Law of Torts (3rd Edit.) p. 788). The general theory of the rule is that a defendant should be subject to suit only once for each mass publication of a libel. In that one action, however, a plaintiff may introduce evidence of all sales in all jurisdictions to show the extent of his injury. (Winrod v. McFadden Publications, Inc. (N. D.Ill.1945), 62 F.Supp. 249). I should also observe that many jurisdictions in the past have limited the one cause of action per publication rule to one cause per jurisdiction. Thus, in this case there could be as many as 51 suits (50 states plus the District of Columbia) for the American publications alone.

### ILLINOIS VERSION OF THE SINGLE PUBLICATION RULE

Citing and relying on Insull v. New York World Telegram Corp., supra, Garrison argues that as the single publication rule is applied in Illinois, it not only determines when the article was first published to toll the statute of limitations and, to avoid multiple suits, limits a plaintiff to one cause of action, but that it also determines where the tort occurs. In other words, it anchors the tort to that one jurisdiction where publication first occurred.

Assuming that the intent of the *Insull* holding was to limit the cause of action to the state of first sale, the decision has been severely criticized [14] and recently expressly rejected by the Court of Appeals for the Second Circuit. (Buckley v. New York Post Corporation, 373 F.2d 175 (1967)). I find the reasoning of that court exceptionally persuasive and worthy of lengthy quotation:

"To hold that the single-publication rule exempts a publisher of a newspaper or magazine or a broadcaster from a long-arm statute that would otherwise have been applicable would be quite as artificial as the 'last event' approach of the first Conflicts Restatement and the separate publication concept of Duke of Brunswick v. Harmer, 14 Q.B. 185, 117 Eng.Rep. 75 (1849), which the new rule was intended to overcome. Elliptical statements that a libel by newspaper is 'complete' upon publication, though often accurate enough in their particular context, should not obscure that the purpose of the single publication rule is not to deprive a plaintiff defamed in another state of a privilege to sue there which the legislature had granted generally to persons injured by wrongful conduct within its borders, but rather to protect the defendant—and the courts—from a multiplicity of suits, an almost endless tolling of the statute of limitations, and diversity in applicable substantive law. See 1 Harper & James, Torts § 5.16 (1956); Prosser, Torts 788–89 (1964). These goals can be sufficiently accomplished by holding that the plaintiff must collect all his damages in one action, that the statute of limitations begins to run on the initial publication, and that substantive issues will be governed by a single law—deciding just which is a harder nut to crack, see Restatement (Second) Conflict of Laws § 379e (Tent. Draft No.

14. Currie, The Growth of the Long Arm; Eight Years of Extended Jurisdiction in Illinois 1963 U.Ill.L.F. 533; Note; Can the Long-Arm Reach Out of State Publishers? 43 N.D. Lawyer 83 (1967).

9, 1964). To be sure, if only the interests of the defendants were to be considered, these objectives could be more certainly accomplished by minimizing the possibilities of suit at a place other than that of initial publication, since that forum presumably would apply its own statute of limitations and, non constat Restatement Second § 379e, might have a bias in favor of its own substantive law. But defamed persons have rights too; the interests of the defendant are not so dominant as to require a mechanical application of the single publication rule in such a manner that circulating a libel outside that state should be treated as if it never occurred.

\* \* \* \* \* \*

The dubious reconcilability of the Insull decision with the broad construction later given the Illinois long-arm statute in Gray v. American Radiator & Standard Sanitary Corp., 22 Ill.2d 432, 176 N.E.2d 761 (1961), has been sharply noted. See D. Currie, The Growth of the Long Arm: Eight Years of Extended Jurisdiction in Illinois, 1963 U.Ill.L.F. 533, 552–54, cited and relied on by Chief Justice Kension in Roy v. North American Newspaper Alliance, Inc., 106 N.H. 92, 205 A.2d 844, 847 (1964). See also Curtis Publishing Co. v. Birdsong, 360 F.2d 344, 348 (5 Cir. 1966) (concurring opinion of Judge Rives); Blount v. T. D. Publishing Corp., 77 N.M. 384, 423 P.2d 421 (1966). In the absence of any relevant decisions by Connecticut courts pointing in the direction of Insull, we decline to apply that decision to the construction of the Connecticut long-arm statute." (pp. 179–180)

In their discussion of the Insull case and Gray v. American Radiator neither party has placed much significance in the fact that Gray was decided after Insull, and the Insull court in determining the law of Illinois in that case did not have the benefit of the Gray rationale. The Court of Appeals for the Second Circuit, in Buckley, appears to accept Gray and reject Insull, indicating that it must view the decisions in those cases as contradictory in policy if not literally. I suggest, assuming Garrison's interpretation of Insull is correct, that there is a basic underlying inconsistency between Insull and Gray, and this being a question of Illinois law I must follow the later decision of the Illinois Supreme Court. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Another development since Insull, ignored by the parties is that the Illinois legislature has adopted the Uniform Single Publication Act.[15] (Ill.Rev.Stat. C. 126 § 11 et seq.) And, while the Uniform Act appears to make no change in Illinois law, since its purpose is uniformity it is certainly plausible that the Illinois legislature in adopting the Act, sought to avoid the approach of the Illinois Courts in applying the Single Publication Rule and as illustrated by Insull and adopt the generally more accepted approach of other states.[16] In-

15. Actually the Act was adopted July, 1959 and Insull was decided December, 1959. However, the Act was not retroactive (Ill.Rev.Stat.C. 126 § 15) and therefore had no application to the case.

16. E.g. See Buckley v. New York Post Corp., 2nd Cir., (Applying law of Connecticut) 373 F.2d 175 (1967); Roy v. North American Newspaper Alliance Inc., 106 N.H. 92, 205 A.2d 844 (1964); Curtis Publishing Co. v. Birdsong, 5th Cir. (Applying law of Alabama) 360 F.2d 344. (1966) (Concurring . opinion of Judge Rives). The logic of these decisions is pursuasive though they are not interpreting the Uniform Act. There are very few decisions under the Uniform Act as only seven states have adopted it, see Vol. 9C Uniform Laws Annotated, p. 171. Blount v. T. D. Publishing Corp., 77 N.M. 384, 423 P.2d 421 (1966), indicates that New Mexico Courts will not interpret the Uniform Act to fix the site of the cause of action. The same may be anticipated by the Courts of California. Note, 44 Calif.L.Rev. 146, 151. See also Gaetano v. Sharon Herald Company, 426 Pa. 179, 231 A.2d 753 (1967); But Cf. Nagoya Associates Inc. v. Esquire, (E.D. Pa., 1960) 184 F.Supp. 184.

deed, Section 3 of the Act, (Ill.Rev.Stat. C. 126 § 13) states: "This Act shall be so interpreted as to effectuate its purpose to make uniform the law of those states or jurisdictions which enact it."

Before I jettison *Insull* in its entirety, I should also observe that in limiting the cause of action to the state of first publication, that decision seems to contemplate that that state is also the center of the publishers activities. Judge Miner in the district court opinion of that case goes to great lengths to explain that Illinois should not be deemed the state of publication unless it bears the "most substantial relation to all communications of the alleged libelous matter":

> "Illinois is not the state from which the multi-state dispersion proceeds, it is not the state from which the multi-state dispersion is directed, nor is it the state wherein occurs the loss of practical control over dispersion which is characterized by the initiation of movement over the instrumentalities, or due to the inexorable operation of physical laws, in commerce." (172 F. Supp. 615 at 634)

■ If this is, in the view of the Seventh Circuit Court of Appeals, the correct criteria, then in the case before me Illinois is clearly the appropriate state of first publication as it bears the "most substantial relation to all communications of the alleged libelous matter" and it is the one state from which the "multi-state dispersion was directed" and the "loss of control" occurred.

Earlier in the *Insull* opinion Judge Miner also stated:

> "Illinois law, including Illinois conflicts law, recognizes that but one 'publication' occurs, notwithstanding the number of states in which, or third parties to whom, an item is communi-

cated. From this the court finds that Illinois conflicts law determines the state of 'publication' in harmony with the 'single publication' principle, and that the choice must be that state which bears the *most substantial relationship* to *all* communication to third parties in all states in which communication occurs." (172 F.Supp. at 633) (Emphasis supplied)

Judge Miner's approach, if I interpret it correctly, would certainly conclude that in this case Illinois bears the most substantial relationship to the communication and should therefore be determined to be the state of publication.

Finally, even applying the first publication rule of *Insull* in its strictest sense and as argued by Garrison, I conclude that the state of first publication in this case was Illinois where the magazines were first delivered to the postal service and to other carriers for distribution and thus made available for public consumption. (See Hartmann v. Time Inc., 3rd Cir., 166 F.2d 127 (1948); Tocco v. Time Inc., (E.D.Mich., 1961) 195 F.Supp. 410; Anno. Publication of Libel for Purposes of Statute of Limitations, 1 A.L.R.2d 384; Prosser, Law of Torts (3rd Edit.) p. 788). In Judge Miner's words, Illinois is, " * * * the state from which the multi-state dispersion proceeds", * * * it is the state * * * "from which the multi-state dispersion is directed," * * * it is the state, * * * "wherein occurs the loss of practical control over dispersion which is characterized by the initiation of movement over the instrumentalities, or due to the inexorable operation of physical laws, in commerce." (See Insull v. New York World Telegram Corp., 172 F.Supp. at 633).

I am aware that the authorities are not in agreement as to when the act of publication is complete [17] and that the

---

17. See cases cited at Anno. Publication of Libel for Purposes of Statute of Limitations, 1 A.L.R.2d 384 and cases cited in A.L.R.2d Later Case Service; Prosser, Law of Torts (3rd Edit.) p. 788, Note 98; The Single Publication Rule in Libel: A Fiction Misapplied 62 Harv.L.Rev. 1041 at 1042–1043 and notes 16–19; An Examination of Publication and Choice of Law Problems in Multi-State Libel, 56 North W.L.Rev. 823 at 825 Note 213, where the author adds the suggestion that

principle here adopted for purposes of this case, is contrary to some authority, particularly the view taken by the United States Court of Appeals for the Second Circuit in Zuck v. Interstate Publishing Corp., 317 F.2d 727 (1963) (Interpreting the law of New York).

■ In reconciling this decision with the *Zuck* opinion I only observe that previous New York decisions by the federal and state courts had clearly held, as I do here, that publication occurs when the alleged libelous product was delivered to common carriers for shipment. (Gregoire v. G. P. Putnam's Sons, 298 N.Y. 119, 81 N.E.2d 45 (1948)); Backus v. Look, Inc., (S.D.N.Y., 1941) 39 F.Supp. 662). The Second Circuit rejected these decisions on what it felt were sound policy reasons, namely, to prevent the running of the already short (one year) statute of limitations. Without the benefit of the few days between shipment and receipt by subscribers in that case, the plaintiff's action would have been barred by the statute.

Equally compelling policy considerations influence my decision to accept the rationale of the earlier New York cases and the other authorities I have cited. By this motion I am asked to determine *where* the tort occurred and not *when* it occurred. It seems much more sensible to me to conclude that publication occurred in Illinois, the vortex of Playboy's activities, than in some distant forum where, however fortuitously, the first copy of Playboy was sold by a news vendor or reached the hands of a subscriber.

## FIRST AMENDMENT CONSIDERATIONS

Even assuming the "Commission of a Tort" in Illinois, Garrison argues that because this is a libel case certain First Amendment considerations require a greater showing of contacts to satisfy due process than is required to exert jurisdiction over other types of tortious activity. This principle has been announced and applied by the United States Court of Appeals for the Fifth Circuit. New York Times Co. v. Connor, 365 F.2d 567 (1966); Buckley v. New York Times Co., 338 F.2d 470 (1964). In the *Connor* case the Court expressed the fear that the publisher, (the New York Times), who circulated only 395 issues of its newspaper in Alabama, would forego those few sales rather than bear the burden of defending libel actions in Alabama. Thus, to that extent, the free exchange of ideas would be curtailed.

■ The soundness of applying these First Amendment considerations to jurisdiction questions has been questioned.[18] I find it unnecessary, however, in disposing of this motion, to pass on the merits of the Fifth Circuit approach. First, this case involves a publication in a national magazine rather than a newspaper. On this basis alone, the Fifth Circuit has distinguished the Saturday Evening Post from the New York Times. Curtis Publishing Company v. Golino, 5th Cir., 383 F.2d 586 (1967). Our case involving Playboy is of course much more analogous to the Saturday Evening Post case than to those involving the New York Times. Second, the Fifth

the most logical test is to treat the first communication to a third person as completing the publication. Thus, the statute would be measured from when the issue was sent to subscribers or shipped to wholesalers, whichever happened first.

18. Buckley v. New York Post Corp., 2nd Cir., 373 F.2d 175 (1967); Long-Arm Jurisdiction Over Publishers: To Chill A Mocking Word, 67 Colum.L.Rev. 342 (1967); Exercise of Jurisdiction Over a Newspaper Vacated on the Basis of The First Amendment, 35 Fordham L.Rev. 726 (1967); Due Process and First Amendment Considerations in Libel Cases, 52 Iowa L.Rev. 1034 (1967); Constitutional Limitations to Long-Arm Jurisdiction in Newspaper Libel Cases, 34 U. Chi.L.Rev. 436 (1967). Contra: Carrington and Martin, Substantive Interests And The Jurisdiction of State Courts, 66 Mich.L.Rev. 227 (1967); Jurisdiction —Libel—First Amendment's Role in Determining Place of Trial in Libel Actions 65 Mich.L.Rev. 542 (1968).

Circuit cases of *Connor* and *Buckley* dealt with delicate issues of race relations, an issue not present here. (Again see Curtis Publishing Company v. Golino, 5th Cir., 383 F.2d 586 (1967)). Third, the added protections the Fifth Circuit Court feels necessary to assure the free exchange of ideas are directed to the publishing company, (e. g. the New York Times) as opposed to the author of a particular article. Applied here, they are directed to Playboy, and not Garrison. Fourth, one objective apparently sought by the *Connor* and *Buckley* cases is to assure that an important publication is subject to suit only at a forum reasonably close to the center of its activities. That objective is attained here. Playboy is being sued and defending without objection at the vortex of its activities.

 In conclusion I should state that while this memorandum and opinion does not discuss every contention and argument raised by the parties, all have been considered. For example, I appreciate the fact that plaintiff is not a resident of Illinois. Section 17 of the Illinois Act does not require residency. More important, plaintiff alleges he was injured here. I suggest that a policy of opening our courts to residents injured here, while closing them to non-residents also injured here would be a form of discrimination difficult to defend.

The rationale of Curtis Publishing Co. v. Birdsong, 5th Cir., 360 F.2d 344 (1966), relied on by Garrison for the proposition that plaintiff must be a resident of the forum state, is unimpressive and inapplicable to the facts of this case. First, since Playboy has answered plaintiff's complaint, this case, in the main, must be tried in this Court. Second, the circumstances here are completely inapposite to those in *Birdsong*. Due to Playboy's extensive operations here, Illinois has a considerable interest in this litigation. Again, we are here at the vortex of Playboy's activities. As I read *Birdsong,* that Court would likewise conclude that under the circumstances of this case, Illinois is the most appropriate place for trial.

I am not unmindful of the argument raised by Garrison that he may also be subject to suit in those states where the article was first presented on the newsstands and thereby, in his view, first published. He may also be sued in states which follow some form of a multiple publication rule. If either defendant is threatened with multiple suits, this court has the power to grant appropriate relief. I assure each defendant that power will be exercised.

Since I hold that plaintiff has adequately alleged that defendant Garrison has committed a tortious act within Illinois, his motion to dismiss for improper venue is without merit, as plaintiff's claim arose here. (28 U.S.C. § 1391).

Accordingly, the motions of Garrison to dismiss for lack of jurisdiction and for improper venue are each and both denied.