# CRONLEY v PENSACOLA NEWS-JOURNAL, INC. v CHILDERS
## Case No. 88-5742-CA-01
First Judicial Circuit, Escambia County

July 10, 1989

### APPEARANCES OF COUNSEL

**J. Nixon Daniel, III,** for plaintiff.

**William H. Clark,** Clark, Partington, Hart, Larry, Bond, Stackhouse & Stone, for defendant, Pensacola News Journal, Inc.

**Talbot D'Alemberte,** for third party defendant, W. D. Childers

### OPINION OF THE COURT

BEN C. WILLIS, Circuit Judge.

#### SUMMARY FINAL JUDGMENT

This cause is before the Court on the Motion to Strike Complaint as Sham Pleading, or, in the Alternative, Motion for Summary Judgment, filed by the defendant, Pensacola News-Journal, Inc., and by the third party defendant, W. D. Childers, and the Court having considered

same, together with the pleadings, affidavits, and all other pertinent material in the file, and having heard argument of counsel for the respective parties and examined their memoranda and case citations, and being otherwise advised, it is

ORDERED AND ADJUDGED:

### PLEADINGS AND AFFIDAVITS

1. This cause is an action by James D. Cronley against the Pensacola News-Journal, Inc., the owner and publisher of the Pensacola News-Journal, a publicly circulated newspaper. It is alleged that defendant published false and defamatory information regarding the plaintiff in the August 28 and September 5, 1988, editions of the paper, and that the items were published by defendant with actual malice. The articles complained of were stated as:

(a) August 28, a political advertisement which indicated that Lost Bay Trading Company, a corporation in which plaintiff owns an interest, attempted to purchased 200 acres of Ellyson Industrial Park for $3,000 per acre, "a fraction of its actual value," and further noted that "W.D. said No! No! No!"

(b) Also on August 28, a political advertisement stating that "taxpayers get the Port Royal shaft," indicating that plaintiff, as President of Port Royal, "actually gave the Federal Savings & Loan Insurance Corporation (a government agency) his debt on 25 condos. As taxpayers, this involves millions of *our* dollars."

(c) September 5, a political advertisement which stated that "Cronley's Charges Against W. D. Proven False;" and

(d) September 5, a headline on the front page which stated "Childers Cleared in Ethics Probe."

2. It is alleged that the article on the Ellyson Industrial Park matter and that on Port Royal imputed to plaintiff dishonesty and financial irresponsibility and have subjected him to ridicule, distrust and contempt, and further imputed to him conduct and personal characteristics incompatible with the proper pursuit of his profession as a developer and his desire to serve the community politically.

3. As to the political ad and headline on September 5, it is alleged they imputed to the plaintiff dishonesty and has implied that he is a liar, in that the allegations giving rise to the Ethics Commission were matters which were brought in a complaint filed by the plaintiff. It is alleged that they also imputed to plaintiff conduct and personal characteristics incompatible with the proper exercise of his profession

132

and imputes to him conduct and characterization incompatible with his seeking election as state senator, as they call in question his integrity and judgment.

4. Plaintiff claims these publications have inflicted on him mental anguish and continuing damage to his reputation in the community and he seeks compensatory and punitive damages.

5. The defendant newspaper filed its answer, admitting the publications on August 28 and September 5, 1988, of the times mentioned in the complaint. It denied all allegations of defamation or damage. The defendant further filed a First Amended Answer which, in addition to the responses contained in the original answer, there were the following asserted "Affirmative Defenses":

(a) The publications were privileged as statements made by a candidate for State Senator, touching upon and concerning the background and fitness of his political opponent in an election campaign then being contested;

(b) Publications are privileged as fair comment about a candidate for public office;

(c) Publications are privileged and are speech and publications constitutionally protected under the First and Fourteenth Amendments of the United States Constitution, and Article I, Section 4, of the Florida Constitution; and

(d) Statements complained of were true and published with good motives, requiring acquittal and exoneration of defendant in accord with Article I, Section 4, Florida Constitution.

6. Contained in the First Amended Answer is a Third Party Complaint which seeks to bring in W. D. Childers. In Count I it is alleged that Childers is a state senator, reelected in November, 1988, and that in the 1988 Democratic primary he was opposed by the plaintiff, James D. Cronley. During the course of the election campaign, it is further alleged, Childers purchased advertising space in the defendant newspaper publications including some touching upon and concerning the background or fitness of his opponent, Cronley. Copies of such publications are attached to the pleading. It is stated that Childers represented to defendant that such advertisement were true and defendant News-Journal relied upon them in accepting the items for publication. Referring to the action against it by Cronley, the News-Journal seeks indemnity from Childers for any and all recovery by Cronley in the case, as it is Childers' ads that are the subject of the suit. In Count II, it seeks to invoke a covenant contained in the "Retail

and Classified Contract," executed by Childers with the defendant in consideration of the News-Journal's acceptance of his advertisement for publication. The advertiser (Childers) agrees to hold harmless and indemnify the publisher "from all damages, costs and expenses, of any nature whatsoever, for which the company may become liable by reason of its publication of the advertiser's advertising." It seeks indemnity by Childers for any loss it may sustain by the Cronley action.

7. Senator Childers did not file an answer to this Third Party Complaint, but an acceptance of service of process and notice of appearance in behalf of W. D. Childers were filed by Talbot D'Alemberte, attorney at law.

8. The Motion to Strike Complaint as a Sham Pleading, or, in the Alternative, Motion for Summary Judgment, is filed on behalf of both the defendant News-Journal and W. D. Childers.

9. It is to be noted that the action by plaintiff Cronley is solely against the News-Journal, and this posture of the case will be regarded as controlling of legal points to be considered which are raised by the motion.

10. In support of the motion are three affidavits, by Anne Saul, by George Gutierrez and by W. D. Childers. In opposition are affidavits by plaintiff Cronley and by Cooper Yates.

11. Ms. Saul states she is and in September 1988 was Executive Editor of the News-Journal. She further states that the News-Journal on September 5 published an article reporting the results of an investigation of Senator Childers of charges brought by his opponent in the Democratic primary, Jim Cronley. The article reported that Florida Assistant Attorney General Craig Willis had reviewed the findings of an Ethics Commission investigation, determined that there was no probable cause as to each allegation, and recommended that the Ethics Commission clear Senator Childers of all charges. The second sentence of the article states that the Ethics Commission would meet at a later hearing to consider the recommendations. The headline of the article was: "Childers Cleared in Ethics Probe." The next day a clarification was published with regard to the September 5 headline, which explained that the Florida Attorney General's office has recommended that the Ethics Commission drop the charges, but that the Ethics Commission must hold a hearing on the matter. Ms. Saul stated the purpose of the clarification was to make clear that the recommendation, though itself clearing Senator Childers of wrongdoing, was not the same as the Ethics Commission determination. It is further stated that

134

on December 1, 1988, when the Ethics Commission considered the Attorney General office's recommendation, it voted unanimously to clear Senator Childers of all charges. She states the headline and article were published in good faith to inform the public of the results of an inquiry into the ethics of an incumbent state senator during an election year.

12. The affidavit of Mr. Gutierrez identifies him as the Director of Advertising for the News-Journal since July 31, 1986, with duties which include supervision of advertising sales. He states he is generally responsible for acceptance or rejection of advertising for the newspaper. He related that when Mr. Childers submitted advertisements relating to Lost Bay Trading Company, he asked for documentation to support statements that Mr. Cronley had an interest in Lost Bay Trading Co., Inc., and that the proposed purchase by Lost Bay was for $3,000 per acre. In response, Mr. Childers delivered some seven documents: (a) a 1988 annual report of the Lost Bay Corporation to the Secretary of State showing Mr. Cronley as Vice-President and Treasurer; (b) Articles of Incorporation of Lost Bay showing Mr. Cronley as incorporator; (c) public disclosure of financial interests of James D. Cronley showing a 50% interest in Lost Bay; (d) proposal of Lost Bay for the stimulation of Ellyson Industrial Park dated February 14, 1984; (e) minutes of meeting of Pensacola-Escambia Development Commission dated February 22, 1984; (f) minutes of P-E Development Commission dated April 24, 1984; and (g) minutes of P-E Development Commission dated April 25, 1984. With regard to the advertisement pertaining to Port Royal, he requested Childers to furnish documentation that FSLIC took control of Port Royal condos and he furnished a certified copy of a conveyance and Partial Assignment of Lease recorded in the public records. Also, in connection with the ad that Cronley's charges against Childers "proven false," the affiant asked for documentation that the charges were proven false. He submitted a report of Advocate's recommendation to the Ethics Commission filed with the Ethics Commission on August 29, 1988. He questioned the use of the word "false" in reference to charges that were said to be "unfounded." He states that Mr. Childers submitted Webster's Dictionary showing "false" and "unfounded" as synonyms. It is further stated that all statements in the advertisements were represented by Mr. Childers as true, and that the affiant did not know that any of the statements in the advertisements were false and had no reason to believe any of the statements were false.

13. The affidavits of Mr. Childers and Mr. Cronley refer largely to the opinions of each as to the accuracy of the contested publications

**135**

and of their effect. An affidavit by Mr. Cooper Yates relates to conversations he had with various personnel of the News-Journal and certain conditions and actions which he concluded revealed bias on the part of the News-Journal. He also expressed opinions as to the falsity of certain published material and its adverse effect upon the plaintiff, Mr. Cronley.

## PERTINENT LAW

14. Cases which are deemed pertinent to the issues in this case are discussed in the paragraphs following:

15. There is a body of case law, largely U. S. Supreme Court decisions, which specify the scope of liability of a news publisher to a public officer or public figure for defamatory falsehood. In the landmark case of *New York Times Company v Sullivan,* 376 U.S. 254 (1964), it was held that constitutional protections for speech and press require a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice," that is with knowledge that it false or with reckless disregard of whether it was false or not. In *St. Amant v Thompson,* 390 U.S. 727 (1968), it was pointed out that failure of the publisher to investigate statements for their accuracy does not itself establish bad faith. There must be sufficient evidence to permit the conclusion that the defendant publisher in fact entertained serious doubts as to the truth of his publication.

16. In *Monitor Patrio Company v Roy,* 401 U.S. 265 (1971), it was held that a candidate for an elective office was a "public official" or "public figure" within the rule concerning recovery of damages for libel and slander of a "public official" or "public figure." Reverting here to the *New York Times* case, *supra,* it is there pointed out that constitutional protections for speech and the press were fashioned to assure unfettered interchange of ideas for bringing about political and social changes desired by the people, and that it is a fundamental principle of the constitutional system that there be maintenance of opportunity for free political discussion to the end that government may be responsible to the will of the people and that changes may be obtained by lawful means. It was said that there is a national commitment "to the principle that debate on public issues must be uninhibited, robust, and wide open, and that it may well include vehement, caustic and sometimes unpleasant sharp attacks on government and public officials." This case also indicates that proof presented to show actual malice must be with "convincing clarity" to constitutionally sustain a

136

judgment for a plaintiff public official against a publisher. In *Gertz v Welch,* 418 U.S. 323 (1974), this degree of proof was described as "clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth."

17. In *Garrison v Louisiana,* 379 U.S. 64 (1964), it was observed that "any criticism of the manner in which a public official performs his duties will tend to affect his private, as well as his public reputation. . . . The public official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, anything which might touch on an official's fitness for office is relevant." In the *Monitor Patriot Co.* case, *supra,* it was stated:

"Given the realities of our political life, it is by no means easy to see what statements about a candidate might be altogether without relevant to his fitness for the office he seeks."

18. In *Anderson v Liberty Lobby, Inc.,* 471 U.S. 1134 (1986), it was held that, in considering a motion for summary judgment, there is no genuine issue of material fact if the evidence presented in opposing affidavits in a libel action involving a public figure is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence.

19. In *Menendez v Key West Newspaper Corporation,* 293 So.2d 751 (Fla. 3d DCA 1974), a libel action was brought against defendant publisher by a candidated for reelection to the Key West City Commission because of advertisements just prior to a primary election which charged plaintiff was apparently un-American and displayed pro-Castro allegiance. Plaintiff lost the election. The ads were signed by two individuals who were made defendants in the suit along with the publisher. Previously the court granted a motion to dismiss filed by one of the private advertisers and denied it as to the other. The trial court sustained a motion for summary judgment by the publisher. The appellate court affirmed and, among other things, stated:

"It has been held that in cases of this nature which involve the First Amendment area and where the issue is recklessness employed in the publication of alleged false and libelous information, that summary judgments should be more liberally granted," citing *Washington Post Co. v Keough,* 365 F.2d 965 (1966), cert. denied, 385 U.S. (1967).

In *Curtis Publishing Co. v Butts,* 388 U.S. 130 (1967), it was observed:

" . . . injured persons should not be relegated [to remedies which]

make collection of their claims difficult or impossible unless strong policy considerations demand." citing *Buckley v New York Post Corp.,* 2 Cir., 373 F.2d 175, 182.

It was also stated in *Butts, supra:*

"Truth has become an absolute defense in almost all cases, and privileges designed to foster free communication are almost universally recognized."

## THE MOTION

20. This Court has undertaken to glean from the pertinent portions of the file facts that are fully established and to test whether such are sufficient to support the motion made by the defendant publisher in the case. The motion is pursuant to Rule 1.150, Florida Rules of Civil Procedure, which provides that:

"If a party deems any pleading . . . filed by the other party to be a sham, he may move to strike said pleading . . . before the case is set for trial and the court shall hear said motion . . . and if the motion is sustained the pleading to which the motion is directed shall be stricken. Default and summary judgment on the merits may be entered in the discretion of the court . . ."

21. The rule also requires the motion to strike to be verified and set forth facts on which the movant relies which may be supported by affidavit.

22. The motion filed in this case is "to strike complaint as sham pleading, or in the alternative, motion for summary judgment." The motion itself is not verified and plaintiff urges that it be stricken for his deficiency. The defendant argues that supporting affidavits ae sworn and this should suffice.

23. Rule 1.150 authorizes the striking of a pleading found to be a sham, and it also grants discretion to the court to enter a summary judgment on the merits. For a pleading to be stricken as a sham, it must be shown to be palpably or inherently false. *Slatko v Virgin,* 328 So.2d 499 (Fla. 3d DCA 1976); accord *Jaruagua Enterprises, Inc. v Dom, Inc.,* 330 So.2d 702 (Fla. 3d DCA 1976). The striking of a pleading as a sham is a drastic action and its exercise must be only pursuant to clear manifestations of meritless contentions. It requires a showing over and above what is required to grant summary judgment because of absence of genuine issue of material fact. In this case it is deemed that the showing falls short of establishing sham pleading but it is found that there is ample ground to consider and adjudicate

138

summary judgment. In view of this ruling, it is unnecessary to further consider the absence of verification of the motion to strike.

## THE ETHICS COMMISSION REPORTS

24. It is undisputed that plaintiff, Cronley, and defendant, Childers, were opponents in the 1988 Democratic primary election for the office of State Senator, District One. The political campaign was vigorously waged by both candidates in which attacks and criticisms were made by each against the other. In June 1988 Mr. Cronley filed with the Florida Commission on Ethics a complaint against Childers in which it was charged that there had been a violation of Section 112.313, Florida Statutes, which prohibits a public officer from soliciting or accepting anything of value to the recipient, including a gift that would cause a reasonably prudent person to be influenced in the discharge of official duties. It attached excerpts from certain depositions in the pending lawsuit of *Croft v Gulf Power Corporation* which were described as showing gifts and services provided by Gulf Power to W. D. Childers. It was further states that it was believed that Childers received these gifts and services of Gulf Power and never filed the value with the State of Florida. It was further stated there was belief that certain executives at Gulf Power provided these goods and services to gain a favorable position with a powerful leader of the Florida Senate.

25. W. D. Childers was at the time the incumbent senator from District One and was a candidate for reelection. He had been a member of the Florida Senate since 1970.

26. The Executive Director of the Ethics Commission determined that a preliminary investigation of the charges be undertaken for a probable cause determination as to whether Senator Childers violated (a) Section 111.011, Florida Statutes, which requires each elected officer to file a statement containing all contributions received by him or his behalf and expenditures from or disposition made of such contributions which are not otherwise required to be reported by Chapter 106, or .(b) Section 112.3145, Florida Statutes, which requires disclosure of any gift or gifts from one source totaling over $100. The charges to be investigated are as follows:

(a) Gulf Power waived or reduced its fees for underground electrical service to respondent's developments;

(b) Gulf Power sponsored or assisted in putting on a fish fry for respondent at the local fairgrounds;

(c) Gulf Power employees took tables and chairs to respondent's campaign headquarters;

(d) Gulf Power employees transported a riding lawnmower to the respondent's house;

(e) Gulf Power employees moved items purchased by respondent to a Gulf Power warehouse where they were stored, then moved the items to another warehouse, and finally moved the items to some trailers owned by respondent;

(f) Gulf Power purchased several quonset huts from the respondent and moved them from his property;

(g) Gulf Power employees delivered a freezer and two vacuum cleaners to the respondent's office using a Gulf Power vehicle;

(h) Gulf Power employees moved some 18-wheel trailers for respondent;

(i) Gulf Power employee picked up loads of sod from a nursery and delivered them to respondent's residence;

(j) A high pressure washer from the Gulf Power repair shop was used to clean someone's house at Gulf Power expense; it is not possible to determine from the deposition excerpt whose house is referenced;

(k) Gulf Power purchased equipment and other items which respondent had obtained after a chain of store went out of business, when that equipment was not needed by Gulf Power;

(l) Gulf Power provided two heaters and a window air conditioner for a restaurant owned by respondent and did some wiring in connection with installation.

27. The case was referred by the Commission to A. J. Northrup for investigation and report. This was in implementation of the Commission's powers under Article II, Section 8(f), Florida Constitution, to conduct investigations and make public reports on complaints concerning breach of public trust. Mr. Northrup's report of 38 pages reflects a thorough pursuit of inquiry into the charges with interviews with suggested witnesses and other examination of circumstances. It included a letter from Mr. Ed Austin, State Attorney for the Fourth Circuit, which was in response to the investigator's earlier letter. It stated, among other things:

"The allegations described in your letter are similar to the allegations we looked into eight years ago. In 1980 I was legal advisor to the Statewide Grand Jury and an investigation was conducted concerning allegations made against Senator Childers. We found those allegations to be without substance and concluded our investigation without filing any charges against Senator Childers."

28. The Report of Investigation was submitted to the Department of Legal Affairs and Craig B. Willis (no relation to the undersigned judge), an Assistant Attorney General, was designated as Advocate to review the complaint and report of investigation and to submit recommendations to the Commission in accordance with its rules. The Advocate's recommendations contained a detailed statement of the charges and applicable law and an "Analysis" which contained a comprehensive discussion of each charge and the investigator's reports of his inquiry into such charges. After discussing each charge, there was a recommendation of a finding of no probable cause. There was also reference to the letter of State Attorney Ed Austin with regard to a 1980 Statewide Grand Jury investigation. It was stated that the Grand Jury investigation took place in 1980, which is much closer in time to the alleged events than the present investigation. The Advocate observed, after discussing the Grand Jury inquiry, the following: "However, standing alone the present ethics investigation would mandate a recommendation of no probable cause." The Conclusion, set forth in the Advocate's report, states:

" . . . I have reached recommendations of no probable cause as to each of the allegations raised in this complaint for various reasons ranging from a clear demonstration of no gift to, ir involvement by, the Respondent to stale allegations for which it is impossible to exonerate or excoriate the Respondent."

The "Recommendation" set forth at the conclusion merely states, "There is no probable cause to believe the Respondent violated Sections 111.011 or 112.3145, Florida Statutes, as alleged."

29. It is in reference to the Advocate's report that the September 5 political ad and the News-Journal headline in the same day are involved. The ad states in rather bold type, ":Cronley's Charges Against W.D. Proven False" and also states "Attorney General's Office Finds Cronley's Charges 'Unfounded.' " Also in reference to the report of the Attorney General's office it quoted the conclusion of the report with the recommendation, "There is no probable cause to believe the Respondent violated Sections 111.011 or 112.3145, Florida Statutes, as alleged." There was a photographic reproduction of the top of the first page of the Advocate's recommendation showing it was from the Office of the Attorney General of Florida, was from Craig B. Willis and was in reference to Advocate's recommendation in the Ethics Complaint against W. D. Childers. The headline in the September 5 issue stated, "Childers Cleared in Ethics Probe." The body of the news article stated in the opening paragraph that the Florida Attorney General's

141

office had recommended that State Senator W. D. Childers be cleared of all charges brought before the State Commission on Ethics by primary opponent Jim Cronley.

30. It is contended that the Childers' ad statement that Cronley's charges were "proven false" and that the Attorney General's office finds Cronley's charges "unfounded" are not true, as the Advocate's recommendation only stated that there was "no probable cause" to believe Childers had violated certain ethics statutes. The charge leveled at the newspaper headline that Childers was "cleared" in ethics probe is that it is false in that the Advocate's recommendation was not action of the Ethics Commission but only a recommendation, which did not "clear" Childers of the charges. It is contended that "proven false," "charges unfounded," and Childers "cleared" are false and defamatory, and that the News-Journal knew that they were.

31. Webster's New Collegiate Dictionary (copyright 1959) defines the word "false" as "not true; incorrect; not well founded." The word "clear" is stated to mean "innocent; to vindicate" and as a transitive verb, "to free from imputation of guilt, blame, or the like; to vindicate." The term "probable cause" is described as "a reasonable ground of presumption that a charge is well founded." It would follow that the absence of reasonable ground of presumption that a charge is well founded would constitute "no probable cause" or "unfounded." Funk and Wagnalls New Comprehensive International Dictionary defines "clear" as "free from encumbrance, responsibility, or guilt."

32. In view of these definitions and the normal reactions of the general public to the terms which are criticized and which appeared in the September 5 publications, it appears that the use of "false" and "unfounded" are descriptive of the Advocate's report and recommendations and are fair representations of what the report stated. The report was a significant and public analysis of charges of ethics violations which Mr. Cronley had initiated before the Ethics Commission and which had been processed to the point of submission of the Advocate's report. Such report was not the action of the Commission but it was an official action produced in concluding a study and analysis of evidence pertaining to the charges originally made. The statement in the ad that "Cronley's charges against W. D. proven false" is not an untrue characterization of the effect of the Advocate's report. It is not the technical or restricted scope of a word in common use that is to be applied in charges in actional defamation, in the light of the rules established in case law defining constitutional protections of the First Amendment.

33. What is said about the September 5 ad is even more applicable to

142

the September 5 headline, "Childers Cleared in Ethics Probe." The Advocate's report, conclusions and recommendations were crucial and very significant parts of the "ethics probe" and its language certainly "cleared" Childers as being free from guilt of ethics violations. It is an accurate report of a fact and Mr. Cronley's name is not mentioned.

34. It is thus found that there is no genuine issue of material fact but that both September 5 publications are fair comment and accurate fact and will not support a claim of actionable defamation of the plaintiff.

## ELLYSON INDUSTRIAL PARK

35. The Ellyson Industrial Park ad of August 28 is next considered. This is a political ad on behalf of Senator Childers. It in substance charges that plaintiff Cronley is much involved as an officer of Lost Bay Trading Company, Inc., and that this corporation sought to purchased 200 acres of the Ellyson Industrial Park for a residential subdivision, and offered to pay $3,000 an acre - "a fraction of its actual value." Facts developed in the case show that Ellyson Industrial Park had been set aside for industrial development to attract industry and jobs to Northwest Florida. It is under the control of the Pensacola-Escambia Development Commission. It is gleaned from exhibits in the case that the land in this park was conveyed to the PEDC by the United States General Services Administration and that such land had been Ellyson Field, a military installation owned by the United States. It had been deactivated and the land involved conveyed to the local governmental agencies for the benefit of the local community. It appears that its expected use is for industrial development.

36. Exhibits on file establish that James D. Cronley was the incorporator and Vice-President and Treasurer of Lost Bay Trading Co., Inc., a Florida corporation. In 1984 this corporation made a "Proposal for the Stimulation of Ellyson Industrial Park." The proposal recited that the park is "land poor" and that there is clearly more land available in the park than could be used for industrial purposes in the near future. It was proposed that PEDC dispose of land it really doesn't need and that it aggressively pursue office and commercial users for the park's remaining acreage. It proposed the land sold be developed residentially under a comprehensive development plan compatible with the commercial nature of the park that is to be. The proposal by the corporation was to purchase 200 acres of the industrial park for planned residential development. The purchase would involve retirement of some $600,000 of the park's debt to the State. Also included in the proposal is that: "Lost Bay would also fund $1,000,00 in improvements to the commercial and industrial land remaining in Ellyson Park. Those improve-

143

ments would be according to a special development plan, approved and administered by PEDC, with our funds applied toward construction as it progresses up to the one million dollar figure."

37. At a board of directors meeting of PEDC on February 22, 1984, the proposal was presented and discussed by members of the board and others invited to speak. A motion was made with several points which involved review of the planned use of Ellyson Field as an industrial park and to examine other alternatives that may prove to be more beneficial and marketable for use of the site and that the proposal be held in abeyance until alternate plans can be examined and one adopted. On April 24, 1984, the PEDC board met and heard a presentation of the future land plan at Ellyson as presented by a consultant with Land Design-Research, Inc., of Columbia, Maryland. After a discussion, it was agreed the matter would be further considered at the meeting scheduled for the next day. The minutes of the board meeting on April 25, 1984, indicate that there was much discussion of the plan submitted by the consultant on the previous day. A motion to approve the concept plan as presented, "stressing that it should be flexible and based on further studies, carried with 1 negative vote." A committee was appointed to look into a financing package for the park. The minutes of these meetings do not deal with any action or other consideration by the board on the Lost Bay proposal. It can be gathered that the whole subject of development of the park, including whether or not residential uses be permitted, remained for further study and action.

38. The plaintiff characterizes the ad of Senator Childers published by the News-Journal was false in that the Lost Bay proposal not only proposed a $600,00 cash purchase price of the 200 acres, but also that Lost Bay would fund $1,000,000 in improvements to commercial and industrial land remaining in the park. This would reflect an acre price of $8,000.

39. The ad itself is one put in by Senator Childers in connection with his senate contest with Mr. Cronley. It contains a picture of the Ellyson Industrial Park sign on the site of the park. Below the picture in rather large type is this question: "Who wanted to turn 200 acres of this into a subdivision?" Below this, in somewhat smaller type, is the following: "Through Lost Bay Trading Co., Inc. an attempt was made to buy 200 acres of Ellyson Industrial Park to build houses on. This value property has been set aside to attract industry and jobs to northwest Florida, and Lost Bay wanted to pay just $3,000 an acre — a fraction of its actual value." Below this is a photographic excerpt from corporate files in the Secretary of State's office showing that

James D. Cronley was Vice-President and Treasurer of Lost Bay Trading Co., Inc. To the left of the photographed excerpt is the bold typed question: "Who owns Lost Bay?" with an arrow pointing to James D. Cronley's name and designation in the corporate filing. Below this is the following in bold type: "W. D. said No! No! No! We need to keep this valuable land to create new jobs."

40. It is true that the "Proposal for Stimulation of Ellyson Industrial Park," which appears undisputed to be the document referred to in the Childers' ad, does contain both an offer by Lost Bay to purchase 200 acres of the park for planned residential development. It states: "The purchase would involve the retirement of some $600,000 of the park's debt to the state." Also stated is: "Lost Bay would also fund $1,000,-000 in improvements to the commercial and industrial land remaining in Ellyson Park." Those improvements would be according to a specific development plan, approved and administered by PEDC, with our funds applied toward construction as it progresses up to the one million dollar figure."

41. As part of the proposal, in tabular form designated as Figure 1, is a "Cash Flow Analysis" in which the terms of the proposal were set forth in one column. It has certain numbered footnotes, number 2 of which (referring to the proposal) says: "Assumes sale of 200 lots (acres) at $3,000 per lot (acre)." In footnote 4, which is beside the figure $200,000, is explained: "Reflects cost reduction of $1.2 million for the 200 acres to be sold to Lost Bay, less $1.0 million in development costs paid by Lost Bay." This item is in the Expenses and Costs of the Cash Flow Analysis of "Lot Development Costs" under the Lost Bay proposal.

42. The thrust of the ad is a criticism of the Lost Bay proposal to divert 200 acres of the park from industrial uses to a residential subdivision. The point is made that this property has been aside for industry and jobs to Northwest Florida and that it should be kept to create new jobs. There is the statement that "Lost Bay wanted to pay just $3,000 an acre — a fraction of its actual value." There was also the pledge of up to a million dollars to be available to PEDC to develop remaining land under a plan administered and adopted by PEDC.

43. It can be deduced from the proposal that it was only $3,000 per acre that was to be the purchase price of 200 acres and such were to be forthwith developed as residential sites. The $1,000,000 commitment was available afterwards as improvements were made to other land. Thus the statement in the ad that Lost Bay wanted to pay just $3,000

145

per acre is a true statement of what was the consideration for a conveyance of the 200 acres to Lost Bay would be. The statement in the ad that this price is "a fraction of its actual value" is an expression of opinion of the advertiser. It appears that Childers did express his opinion that the land was worth $10,000 an acre, which would be more than the $8,000 per acre which could be computed if the $1,000,000 pledge for improvements is figured into the per acre price proposal. The News-Journal had the documentation before it before publication. Under all of the circumstances, its conclusion that the ad was not false and defamatory is supported by undisputed facts. It had the right to publish the advertiser's opinion of the land value involved.

44. Accordingly, it is concluded that there is no genuine issue of material fact but that this publication is not false or defamatory to the plaintiff.

### PORT ROYAL

45. This ad is another by Childers in his political campaign. It states that his opponent reported a net worth of $2,137,513 and paid no income tax. This part of the ad is not challenged. The part under attack is at the bottom of the display, which states: "Taxpayers get the Port Royal shaft." It also reported that according to Escambia County records dated March 25, 1988, James D. Cronley, as President of Port Royal, "actually gave the Federal Savings & Loan Insurance Corp. (a government agency) his debt on 25 condos." It further stated: "As taxpayers this involved millions of *our* dollars." (Emphasis shown on the ad.) It also is stated that the condos are priced as high as $410,000. To the left of the box containing the matters just mentioned is a bold type statement: "With a Net Worth of $2,137,513, Jim Cronley Let the U. S. Government Pick Up His Milti-Million Debt at Port Royal."

46. The plaintiff's claim of false defamation is based upon the fact that the Federal Savings & Loan Insurance Corp. is not funded by general tax funds but by contributions or assessments against the savings and loan institutions whose accounts are insured. It is thus asserted that it is not the United States Government, as such, or federal taxpayers, who are affected by the Port Royal conveyance of condominium units and Partial Assignment of Lease to FSLIC, as Receiver of Firstsouth, F.A. This conveyance is subject to a mortgage in the sum of $7,750,000 given by Port Royal to Firstsouth Federal Savings & Loan Association of Pinebluff, Arkansas.

47. It is technically true that the FSLIC is a government corporation funded by assessments and contributions from the savings and loan

institutions whose accounts the government corporation insures. However, recent well-publicized reports of widespread savings and loan failures with FSLIC being overwhelmed with claims have made the crisis so well known that the Court may take judicial notice that federal tax monies are indeed in jeopardy. Though the FSLIC structure does not itself command tax monies, the Congress is earnestly seeking a solution to the crisis with fair prospects that appropriations of federal monies in massive amounts will be made to protect those who have dealt with these institutions. The fact of conveyance of the mortgaged condos subject to the mortgage to the S&L for which FSLIC is receiver may be fairly classified as letting the U. S. Government pick up Port Royal's large debt, in view of the general national status of this crisis. It is thus found that there is no genuine issue of material fact to support a claim of defamatory falsehood in this ad.

## CONCLUSION

48. It is accordingly adjudged that there is no genuine issue of material fact and that defendant Pensacola News-Journal, Inc., is entitled to judgment as a matter of law. The publications under attack here are robust and spirited and sharply fashioned but do not intrude on the area of actional defamation in the light of declared constitutional latitude of political speech and publication in view of First Amendment rights.

Accordingly, it is

ORDERED and ADJUDGED that the defendant's Motion for Summary Judgment is granted, and plaintiff's complaint be and the same is dismissed and final judgment is awarded defendant Pensacola News-Journal, Inc., together with costs to be hereafter taxes, if not stipulated to, and jurisdiction is reserved for that purpose.

DONE and ORDERED this 10th day of July, 1989.